John P. Squire & others *vs.* New York Central Railroad Company.

J. S. & Co., copartners, bought hogs in Chicago, and sent a drover there to attend and take care of them to Boston. At Suspension Bridge, on the route, they were discharged into the stock yard of a railroad company whose road ran thence to Albany; cars were brought to the yard, and the drover was told by the superintendent of the yard that it was time for his hogs to be loaded, whereupon he told the servants of the company that they could proceed to load, and allowed them to load in his absence. On his return he said to the said servants that they were not suitable cars, but said nothing to the superintendent, who was near by, and, without further remonstrance, suffered the cars to be attached to a train which was to start for Albany in ten or fifteen minuɩₑs, and went to the ticket office to procure a pass. The ticket master gave him the pass, and handed to him at the same time a written contract, saying that he must sign it, and asked him to sign it with the name of J. S., which he did without express authority from his employers, not knowing nor ascertaining the contents, but supposing it to be some contract required about the hogs. This contract was signed also by the station agent, and set forth that it was made between the railroad company, party of the first part, and J. S., party

of the second part; that " the company transport live stock only at first class rates as per tariff," except in certain cases "where they transport them at a reduced rate in consideration of the owner or shipper assuming certain risks as specified below; " and that, in consideration of the agreement of the company to transport to Albany " four car loads of hogs " at the reduced rate, the party of the second part agreed " to examine the cars in which said animals are to be carried," " to load, tranship and unload said stock at his own risk, the company furnishing the necessary laborers to assist," " to go or send some person or persons in the same train with said stock, to take charge of the same, who shall be carried free of charge," and, among other things, " to take the risk of injuries which the animals may receive in consequence of heat, suffocation or of being crowded." The train then started, and on the way the drover discovering that the hogs were suffering from suffocation, spoke to the conductor about their condition, and cut holes in the cars, but did not obtain sufficient ventilation. At Rochester the conductor pointed out the yardmaster, and the drover asked him to cause the hogs to be transferred to other cars, but, upon his reply that there were no other cars there, proceeded with the hogs to Albany, where some of them were found dead from suffocation. *Held*, in an action by J. S. & Co. against the railroad company for the value of the hogs so suffocated, that the defendants were not liable.

CONTRACT by John P. Squire and two others, copartners under the firm of John P. Squire & Co., for the value of forty hogs smothered by crowding and fumes of manure while being carried by the defendants in their cars from Suspension Bridge to Albany in New York. The answer denied negligence of the defendants, and alleged negligence of the plaintiffs as the cause of the injury and that the hogs were at the time of their death being carried under the following special contract, (indorsed " stock release" on the back thereof,) whereby the defendants were exempt from liability for injury resulting from crowding or suffocation:

" New York Central Railroad, Suspension Bridge Station, April 4, 1866. Memorandum of an agreement, made and concluded this day, by and between the New York Central Railroad Company, of the first part, by their station agent at the above named station, and J. P. Squire of New York of the second part, witnesseth: That whereas the said New York Central Railroad Company transports cattle, horses, hogs, pigs, sheep, lambs, calves or other live stock, only at first class rates, as per tariff, excepting in the following cases, viz., where they transport them at a reduced rate, in consideration of the owner or shipper assuming certain risks, as specified below; now, in consideration that the said railroad company will transport for the party of the second part such live stock at the reduced rate

of     dollars per car load, or fifty cents per 100 lbs., which is less than the tariff rates above referred to, the said party of the second part does hereby agree that the party of the first part shall not under any circumstances nor for any cause be held liable beyond the sum of $200 for injury to or loss of any single animal carried pursuant to this agreement, although the actual value of such animal may exceed that amount; and the said party of the second part also agrees to take the risk of injuries which the animals, or either of them, may receive in consequence of any of them being wild, vicious, unruly, weak, escaping or maiming themselves or each other, or from delays, or in consequence of heat, suffocation, or of being crowded, or on account of being injured, whether such injury shall be caused by the burning of hay, straw, or any other material used for feeding said animals, or otherwise, and for any damage occasioned thereby; and also all risk of any loss or damage which may be sustained by reason of any delay in such transportation. And said party of the second part also agrees to examine the cars in which said animals are to be carried, and to take all risk against accidents, injuries or damages that may happen in consequence of insecurity or defect (if any there may be) in the floor, frame or doors of the cars. And it is further agreed that the said party of the second part is to load, tranship and unload said stock at his own risk, the said New York Central Railroad Company furnishing the necessary laborers to assist. And it is further agreed between the parties hereto, that the parties of the second part shall go or send some person or persons in the same train with said stock, to take charge of the same, who shall be carried free of charge, and that such person or persons so riding free shall take all the risk of personal injury, from whatever cause, whether of negligence of the said parties of the first part, or of their agents, or otherwise. And this agreement further witnesseth, that the said party of the second part has this day delivered to said railroad company four car loads of hogs to be transported to Albany on the conditions above expressed. .. M. L. Feggard, station agent.   J. P. Squire."

At the trial in the superior court, before *Lord*, J., there was

evidence that these were part of a lot of four hundred and one hogs which the plaintiffs bought in Chicago, where they sent one Sullivan, a drover, " for the purpose of attending them to Boston," whom they called as a witness, and who testified as follows :

On the afternoon of April 3, 1866, the whole lot arrived with Sullivan at Suspension Bridge, having come over the Great Western Railroad which there connected with the road of the defendants ; and were unloaded and placed in the defendants' yards, and taken care of by Sullivan during the night. The next morning, four of the defendants' double-decked cars, two of them closed box cars, the other two open slatted cars, were run down to the stock yard, and one Quirk, who was " superintendent of the yard " and " superintendent of shipping," informed Sullivan that it was " time, or his turn, for his, the said hogs, to be loaded," and asked and was told by Sullivan how many hogs he had. Men in the employment of the defendants came with the cars, to load them ; and Sullivan, who had a lame hog at some distance from the place, told these men that he would go and attend to it, and that they could proceed to load ; whereupon, without asking him for further directions, they loaded the cars by putting one hundred hogs into each, and dividing the hundred about equally between the two decks, using their own discretion in thus distributing them. When Sullivan returned from attending to the lame hog, the cars were loaded, and ready to run out upon the main track to form part of a train which in ten or fifteen minutes was to start for Albany. Quirk was not present at this time at the place of loading, but was at a place near by, where he had been attending to the weighing of the hogs. Sullivan now observed that two of the four cars were box cars, and said to the men who had been loading them, that he did not think they were proper or suitable cars ; and they replied to the contrary, and said that they had used them all along, and that there had been no trouble or complaint from or about them. Then, without further mentioning his objections to the cars, Sullivan went to the ticket office to get his pass or ticket, and get upon the train,

to which, immediately after this conversation with the men, the cars containing the hogs were run out and attached. The ticket agent gave him his pass, and at the same time handed to him the special contract set forth in the defendants' answer, and told him that he must sign it, and asked him to sign Squire's name to it, directing him where to do so. Not knowing nor ascertaining the contents, but supposing it to be some contract required about the hogs, he thereupon signed it with the name of J. P. Squire. Then he took his seat in the train in a car designed for the drovers, and the train started. On the way, he discovered, upon looking into the box cars, that there was manure on the lower deck of each of them ; and that in the floors of the upper decks there were cracks which admitted the passage of the fumes which arose by the stirring of this manure by the hogs below; that there were not sufficient facilities for ventilation in these cars ; and that the hogs on the upper decks were close under the roofs, on which the sun was shining. Before reaching Rochester, finding that the hogs in these cars were suffering, he spoke to the conductor about their condition, and they succeeded in getting an axe on the train, and he cut some holes into the cars, but was unable to relieve the difficulty. At Rochester the conductor pointed out to him the yard-master there, and he spoke to him about the condition of the hogs and asked him to have the cars switched off and the hogs unloaded into other cars, but the yard-master replied that they had no other cars there, and that he did not think the hogs were suffering so badly as was represented or supposed; and the cars accordingly went on to Albany, where forty of the hogs on the upper decks of the two box cars were found to be dead. On the way from Rochester to Albany Sullivan watered the hogs when he could.

Sullivan also testified that, from his experience as a drover, in his opinion they died from the want of sufficient air, owing to the nature and condition of the cars as before stated ; that there were too many hogs in the box cars, considering their size and condition; that he never knew that such a special contract as the one in question in this case was required or usual, but that he had never before driven live stock over the defendants' road ;

that he had nothing to do with the purchasing of the hogs, or making any contract in relation to them or for the carriage of them ; that he was merely sent to attend the hogs to Boston, to feed them, and take care of them ; that he had no authority from the plaintiffs to make any contract in relation to them or to sign any papers, and none to sign said paper; that he had nothing to do with bargaining for the carriage of the hogs, at Chicago or elsewhere; that the cars of the Great Western Railroad ran to the yard of the defendants at Suspension Bridge ; that he did not apply or arrange for the transportation of the hogs over the defendants' road, or have anything to say about it, or the rate of freight, but that the cars were run down and the hogs loaded by the defendants without any application by or to him, except what was said to him as above recited. The plaintiff John P. Squire gave testimony similar to Sullivan's as to how and for what purposes the latter was sent to Chicago, and that he had no authority given him to make any contracts or to sign or make the contract in question ; that the plaintiffs had shipped hogs over the road before, but never knew or heard of the contract in question until after the commencement of this action, nor ever knew that any such contracts were ever required or used by the defendants.

The defendants introduced in evidence the special contract signed and identified by Sullivan ; and also testimony that it was the form of contract used by them in such cases for some years prior to the transaction in question. But there was no competent proof of any contract of the kind being signed by the plaintiffs, or any one for them, in any other instance.

The judge ruled on all the evidence that the special contract signed by Sullivan constituted a sufficient defence to the action, and directed a verdict for the defendants. The plaintiffs alleged exceptions.

*A. A. Ranney,* for the plaintiffs.

*E. Merwin,* for the defendants.

GRAY, J. The law is now well settled that, in the absence of any statute upon the subject, common carriers may by special contract limit their liability, at least against all risks but their

own negligence or misconduct. *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 382, 383. *York Co.* v. *Central Railroad Co.* 3 Wallace, 107. *Peek* v. *North Staffordshire Railway Co.* 10 H. L. Cas. 493, 494. *Peninsular & Oriental Steam Navigation Co.* v. *Shand,* 3 Moore P. C. (N. S.) 293, 294. *Judson* v. *Western Railroad Co.* 6 Allen, 489, 490. *Ellis* v. *American Telegraph Co.* 13 Allen, 234.

The special contract on which the defendants rely declares that they transport cattle and other live stock " only at first class rates as per tariff, excepting in the following cases, viz., where they transport them at a reduced rate, in consideration of the owner or shipper assuming certain risks, as specified below ;" and that, in consideration of their agreement to transport four car loads of hogs from Suspension Bridge to Albany at the reduced rate, the other party agrees that their liability shall be limited in various respects, which require separate consideration.

The stipulation that they should not under any circumstances be held liable beyond the sum of two hundred dollars for injury to or loss of any single animal was a proper and lawful mode of securing a due proportion between the amount for which they might be responsible and the freight which they received, and of protecting themselves against extravagant and fanciful valuations. *Clay* v. *Willan,* 1 H. Bl. 297. *Harrison* v. *London, Brighton & Southcoast Railway Co.* 2 Best & Smith, 122. *Orange County Bank* v. *Brown,* 9 Wend. 115. The provision by which the owner or shipper agrees to take the risk of injuries to the animals in consequence of their own intrinsic defects differs but little, if at all, from the rule of law in the absence of any contract. *Smith* v. *New Haven & Northampton Railroad Co.* 12 Allen, 531. The putting upon the owner the risk of loss or damage by delay to things so subject to extraordinary injury or expense from that cause as live animals was certainly not unreasonable.

The owner also agrees to take the risk of injuries which the animals may receive " in consequence of heat, suffocation, or of being crowded, or on account of being injured, whether such injury shall be caused by the burning of hay, straw, or any other

material used for feeding said animals, or otherwise." It might not be easy, and in this case is not necessary, to define with accuracy the limits of the operation of the latter part of this clause. It could not, consistently with American decisions of high authority, be held to imply an exemption of the carriers from the consequences of their own negligence or misconduct. *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 383, 384. *Sager* v. *Portsmouth Railroad Co.* 31 Maine, 228. *Wells* v. *Steam Navigation Co.* 4 Selden, 375. Neither does this case call for any opinion upon the validity or effect of the subsequent distinct stipulations that the owner shall take all risk of injuries happening in consequence of defects in the floor, frame or doors of the cars, and that the person in charge of the animals shall take all risk of personal injury from whatever cause, whether negligence of the carriers or their agents, or otherwise.

It is the first part of the clause just quoted, which is immediately involved in this case, by which the owner or shipper agrees to take the risk of injuries to the animals " in consequence of heat, suffocation or of being crowded." He also agrees to load and unload the animals at his own risk, to examine the cars on which they are to be carried, and to go or send one or more men in the same train (who are to be carried free of fare) to take charge of them. The only cause of injury to the plaintiffs' hogs, which the evidence offered at the trial tended to prove, was suffocation by overcrowding and want of ventilation. We are unable to see anything contrary to the policy of the law in permitting the parties to agree together that, in consideration of the payment of a reduced rate of freight, a person who delivers property of this nature to a carrier, to be .aden and transported under the immediate charge of himself or his agent, in cars which he has an opportunity of examining, should bear the risk of injuries resulting from the size and mode of construction of the cars and the manner of stowing the property. A similar contract has been held valid and binding to this extent by the supreme court of Vermont. *Kimball* v. *Rutland & Burlington Railroad Co.* 26 Verm. 247. And in New York, where the contract in question was made and to be performed, and by

the law of which, as was agreed at the argument, the rights of the parties are to be regulated, contracts exactly like this have been held by the court of appeals to be lawful and conclusive, both as to the risks to which the animals are exposed and as to injuries to the person travelling in charge of them. *Bissell* v. *New York Central Railroad Co.* 25 N. Y. 442, and cases cited.

The English cases cited for the plaintiffs arose under the St. of 17 & 18 Vict. *c.* 31, § 7, by which carriers are allowed to make such special contracts only as shall be adjudged to be just and reasonable by the court before which the question may arise. *Peek* v. *North Staffordshire Railway Co.* 10 H. L. Cas. 473. In *Gregory* v. *West Midland Railway Co.* 2 H. & C. 944, the contract was held by its terms to exempt the carriers from all responsibility whatever, and to be therefore unreasonable. In *Allday* v. *Great Western Railway Co.* 11 Jur. (N. S.) 12, the contract which was held to be unreasonable undertook to exempt the carriers, among other things, from risks of " overcarriage," or " any other cause whatsoever ; " and the damage sued for was occasioned by carrying the cattle beyond their destination. Even in that case, Lord Chief Justice Cockburn said, " If it could really be shown that the company had undertaken to carry the cattle at lower rates than they were legally entitled to, in consideration of the owner being content to take his chance of the due arrival and safety of his property, I think, under such circumstances, they would have been protected." And in *Pardington* v. *South Wales Railway Co.* 1 H. & N. 392, it was adjudged that a clause like that now before us was reasonable, and exempted the carriers from liability for loss by suffocation of cattle put by them, not into proper cattle trucks, but into vans closing with lids, one of which became closed on the journey while the servant travelling in charge of the cattle was in another car. See also *Beal* v. *South Devon Railway Co.* 5 H. & N. 875, and 3 H. & C. 337.

In the case at bar, the evidence introduced by the plaintiffs showed that the agent sent by them to attend the hogs on their transportation, after receiving notice from the superintendent of the defendants' yard that it was his turn to load,

permitted their laborers to load the hogs without first himself examining the cars, observed the overcrowding and want of ventilation after the loading was finished and ten or fifteen minutes before the starting of the train, yet did not mention it to the superintendent or any other officer of the defendants, but procured a pass at the ticket office, there signed this agreement in the name of one of the plaintiffs, supposing it to be some contract about the hogs, without reading it or informing himself of its contents, went upon the train, and proceeded on the journey, and, although he perceived the hogs to be suffering from the confinement, spoke to the conductor about it, and asked at Rochester to have them transferred to other cars, yet, on being told there were no other cars there, did not insist on having the cars containing the hogs detached and left, but went on with them to Albany. Even if he had no express authority from the plaintiffs to sign any contract relating to their transportation, he was the person in charge of the property, and the only one with whom the defendants could make the necessary arrangements, and stood towards them for this purpose in the position of an owner. *York Co.* v. *Central Railroad Co.* 3 Wallace, 113. There is no evidence of any fraud on the part of the defendants or their agent or clerk, such as representing that the paper was of no consequence, as in *Simons* v. *Great Western Railway Co.* 2 C. B. (N. S.) 620, cited for the plaintiffs.

Upon these facts, we are of opinion that this action cannot be maintained. The contract so signed, by which the defendants agreed to carry the plaintiffs' property at a reduced rate (of which the recital in the contract itself is sufficient evidence) in consideration of being exempted from certain risks, and such exemptions being lawful and reasonable, at least to the extent involved in this case, and this contract having been acted on by the defendants in transporting the animals, and by the plaintiffs' agent in accompanying them in the transportation, must be treated as constituting the only contract or relation between the defendants and the plaintiffs, by the lawful provisions of which both parties were bound. The plaintiffs became liable to the defendants for the reduced rate of freight

only; and cannot hold them to a responsibility for injuries aris-
ing from overcrowding and suffocation, from which they had
stipulated, in consideration of such reduction, to be exempted,
and to which the negligence of the person sent by the plaintiffs
themselves to attend the transportation contributed.

*Exceptions overruled.*