WILLIS S. NELSON, Respondent, v. THE HUDSON RIVER RAILROAD COMPANY, Appellant.

An authority to deliver goods to a common carrier for transportation includes all the necessary and usual means of carrying it into effect. It can only be executed by obtaining the consent of the carrier to receive them, and the agent is therefore authorized to stipulate for the terms of transportation.

The consignor of goods to a distant consignee, who is the owner, is the agent of the consignee for the purposes of shipping.

The railroad act (chapter 140, Laws of 1850), fixes no tariff or rate of freight. This is a subject of contract solely. The agreement to carry is a consideration for the agreement to pay the freight. The liability to pay freight is the consideration for the agreement to carry. The parties may fix such reasonable rates as they may agree upon, and they may make such limitations to the liability of the carrier as they think proper.

Plaintiff purchased of K., W. & Co. a mirror, directing them to deliver it to the defendant for transportation to Fulton, N. Y. K., W. & Co. sent it by a cartman to defendant's depot. The agent in charge refused to receive it unless the cartman would sign a contract releasing the company from liability for breakage, etc., unless caused by collision resulting from negligence of its servants, in consideration of its agreement to carry at tariff rates. The contract contained a clause that if objection was made to it the freight agent was to be notified before the property was shipped. K., W. & Co. knew of the custom of the company to require such a contract before receiving goods liable to extra hazards. The cartman signed as agent for shipper and owner. It was agreed that the mirror should be retained until the next day, and should be returned if K., W. & Co. requested. The cartman delivered a duplicate of the contract, and stated the facts to K., W. & Co. No dissent or request to return having been made by the latter, the mirror was forwarded and was broken *in transitu*. *Held*,

that K., W. & Co. were authorized to make the contract on behalf of plaintiff, that they could depute the cartman to make it for them, that there was a complete ratification of his acts, and that the contract made by him was valid and binding upon plaintiff.

(Argued January 5, 1872 ; decided May term, 1872.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial district, affirming a judgment in favor of plaintiff, entered upon a decision of the court at circuit upon trial without a jury.

This action was submitted to the court on the trial thereof upon a statement of facts containing the following:

Defendant was, at the time mentioned in the complaint, and for a long time previous thereto, accustomed to refuse to receive or carry, at its ordinary tariff rates, large mirrors and other articles too bulky to be carried in covered cars, and for that reason liable to extra hazards, unless the shippers would execute and deliver to them a release of liability in respect thereto, which custom was well known to Kimball, Whittemore & Co., and to Luke Greehey, but was not known to the plaintiff. Prior to the 14th day of February, 1863, the plaintiff purchased of Kimball, Whittemore & Co. a plate mirror and frame, for which he paid to them $195, and, for boxing and shipping the same, five dollars, being in all $200, which was at the time the value thereof, and directed that the same be well packed in a box, and delivered in good order to the Hudson River Railroad Company for transportation by railroad to Fulton, N. Y., but gave the said Kimball, Whittemore & Co. no other authority to contract with the carrier, or to execute the release, of which schedule " A " is a copy.

On the 14th day of February, 1863, the said property was delivered by Kimball, Whittemore & Co. to Luke Greehey, a cartman with directions to take the said goods to the depot of defendant, and there to ship the same, the said Kimball, Whittemore & Co. not knowing that the package was too bulky to be carried in a covered car.

Greehey carried the same to the depot, and there offered

the same for transportation to one Jerome Buel, an authorized receiving agent of the defendant. It was, in fact, too bulky to be carried in a covered car, and Buel refused to receive the same unless Greehey would first sign the release, a copy of which is hereto annexed marked "Exhibit A," whereupon Greehey signed the said release, and delivered the same to Buel, and Buel then received the said goods for transportation by the defendant, and signed and delivered to said Luke Greehey a receipt therefor.

A duplicate copy of Exhibit A was at the same time signed by Buel and Greehey, and taken by Greehey to give to Kimball, Whittemore & Co., and it was agreed that the box should be retained in defendant's depot till the next day, and should be returned to Kimball, Whittemore & Co., if they requested it. Greehey did give papers to Kimball, Whittemore & Co., and stated all the facts to them above set forth. Kimball, Whittemore & Co. did not before the next day request the return of said box, or communicate to the defendant any dissent from the arrangement.

The defendant, the next day, with ordinary care and diligence, transported the said goods to Troy, and, on the arrival at Troy, the mirror was found to be broken.

EXHIBIT "A."

(COPY.)

HUDSON RIVER RAILROAD COMPANY, }
TWELFTH ST. STATION, NEW YORK, *Feb.* 14, 1863. }

In consideration of the Hudson River Railroad Company, and also in consideration of any roads therewith connecting, receiving and carrying at tariff rates, the following property as now packed, viz. :

W. S. NELSON, FULTON, N. Y. } One box, gilt mirror.

The same being admitted to be articles too bulky to be carried in covered cars, and by reason thereof liable to extra hazards, the owner and shipper hereby release each and all

said companies from any liabilities for damage, or loss of or to said articles by reason of breaking, chafing, fire or water, except such as may be caused by collision or running from the track, resulting from negligence of the company's agents. And the shipper and owner hereby promise to pay freight at such rate, and to claim no deduction therefrom by reason of such damage. Any objection to this contract is to be immediately notified to the proper freight agent of the station at which the property has been delivered, and before said property is shipped therefrom, that a new contract may be made if this contract is not satisfactory.

> (Signed)      W. AFFLECK,
>                    *Station Agent,* per BUEL.
>      LUKE GREEHEY,
>           *Agent for Shipper and Owner.*
> [Signed in duplicate.]

The court directed judgment for plaintiff for the full value of the mirror, with costs, and judgment was entered accordingly.

*Frank Loomis* for the appellant. The contract of Greehey bound K., W. & Co. (*Anderson* v. *Coonley*, 21 Wend., 273.) It was fully ratified by them. (*Gage* v. *Sherman*, 2 N. Y. R., 417; *Seymour* v. *Wyckoff*, 10 id., 213; *Nixon* v. *Palmer*, 8 id., 398.) A railroad company is not liable for goods until there has been a delivery to and acceptance by it. (*Grosvenor* v. *The N. Y. C. R. R. Co.*, 39 N. Y., 34.) K., W. & Co. were authorized to contract for plaintiff; their contract binds him. (*St. John* v. *Van Santvoord*, 6 Hill., 157; Dunlap's Paley's Agency, 3 Am. ed., chap. 3, part 1, § 5; *Jeffrey* v. *Bigelow*, 13 Wend., 518; *Anderson* v. *Coonley*, 21 id., 279; *Smith* v. *Empire Ins. Co.*, 25 Barb., 497; *Medbury* v. *N. Y. & E. R. R. Co.*, 26 id., 564; *N. Y. Life Ins. and Trust Co.* v. *Beebe*, 7 N. Y., 364; Story on Agency, § 160; *Sims* v. *Bond*, 5 Barn. & Adol., 393; *Higgins* v. *Senior*, 8 Mees. & Wels., 834, 844; *Beebe* v. *Robert*, 12

Wend., 413; *Taintor* v. *Prendergast*, 3 Hill., 72; *Van Lien* v. *Byrnes*, N. Y. Com. Pl., 1 Hilt., 133; *Meyer et al.* v. *Harnden's Ex. Co.*, N. Y. Com. Pl., 24 Howard, 290; *N. J. Steam Nav. Co.* v. *Merchants' Bank of Boston*, 6 Howard [Sup. U. S.], 344, NELSON, J., Opinion; *York Co.* v. *Central Railroad* [Supreme Court U. S.], 3 Wallace, 107.) The contract limiting defendant's liability is valid. (Pierce on Am. R. R. Law, 419, 420; Story on Bailm., § 549; Angell on the Law of Carriers, § 127; Redfield on Railways, 266, 273; *Parsons* v. *Monteath*, 13 Barb., 353; *Moore* v. *Evans*, 14 id., 524; *Wells* v. *N. Y. C. R. R. Co.*, 26 id., 641; *Dorr* v. *N. J. Steam Nav. Co.*, 1 Kernan, 485; *Mercantile Mutual Ins. Co.* v. *Calebs*, 20 N. Y., 173; *Same* v. *Chase*, 1 E. D. Smith, 115; *N. J. Steam Nav. Co.* v. *Merchants' Bank*, 6 Howard U. S. R., 344.)

*J. H. Townsend* for the respondent. Plaintiff, as consignee, was presumed to be owner. (*Sweet* v. *Barney*, 23 N. Y., 335.) Defendant's liability does not rest upon contract, but upon its duty as carrier. (*Merritt* v. *Earle*, 29 N. Y., 115, 122.) The person who delivers goods has not, necessarily, power to contract for transportation. (*Robinson* v. *Baker*, 5 Cush., 137; *Stevens* v. *B. & W. R. R. Co.*, 8 Gray, 262; *Fitch* v. *Newbury*, 1 Doug., 1; Redfield's note to *Schneider* v. *Evans*, 9 Am. Law Reg. [N. S.], 540.) The alleged release was without consideration, and therefore void. (*Nevins* v. *The Bay State Steamboat Co.*, 4 Bosw., 225; *Dorr* v. *The N. J. Steam Nav. Co.*, 1 Kernan, 485; *Squire* v. *The N. Y. C. R. R. Co.*, 98 Mass., 239, see pages 248 and 249; *Bissell* v. *N. Y. C. R. R. Co.*, 25 N. Y., 442.) Defendants failed to deliver and cannot avail themselves of the release. (2 R. S. [5 ed.], 693, § 97; Angell on Carriers, §§ 95–98, 287; *Foy* v. *Troy and Boston R. R. Co.*, 24 Barb., 382; *Smith* v. *The N. Y. C. R. R. Co.*, 43 id., 225; *Grant* v. *Johnson*, 1 Seld., 247; *Williams* v. *Holland, Jr.*, 22 How., 137; *Goold* v. *Chapin*, 20 N. Y., 259; *Pepper* v. *Haight*, 20 Barb., 429.) The alleged usage was invalid because personal and local, not

general. (*Macy* v. *The Whaling Ins. Co.*, 9 Met., 354, see on page 365; *Wood* v. *Wood*, 1 Carrington-Payne, 59; *Stevens* v. *R.*, 9 Pick., 198.)

Hunt, C. It is admitted that the defendant was a common carrier at the time of receiving the looking-glass for transportation. It is conceded also, as a matter of law, that a common carrier may limit his liability by express contract. This has been held many times within a few years past (Redfield on Carriers, § 11 *et seq.*; *Dorr* v. *N. J. Steamboat Nav. Co.*, 11 N. Y., 486; *Bissell* v. *N. Y. C. R. R. Co.*, 25 id., 442.)

An agreement, special and limited in its character, was actually made in this instance, and under which the defendant claims exemption from liability. The plaintiff insists that he gave no authority for the making of that contract, and that he is not bound by it. This presents the first question in the case. The facts lie in a nutshell. Having purchased of Kimball & Whittemore, a gilt mirror and frame, for the sum of $195, the plaintiff " directed that the same be well packed in a box by the said Kimball & Whittemore, and *delivered in good order* to the Hudson River Railroad Company, for transportation by them by railroad to Fulton, N. Y., but gave the said Kimball & Whittemore no other authority to contract with the carrier, or to execute the release, of which Schedule A is a copy;" The railroad company refused to receive or transport the mirror except upon the terms of the special contract. Had Kimball & Whittemore authority as the agent of the plaintiff to enter into the same?

The authority to the agent was verbal, and therefore entitled to a more liberal construction than would be given to a formal written instrument. (Story on Agency, §§ 82–87, 100–103.)

The object to be attained was the transportation of the property to Fulton, and no restrictions or limitations were placed upon the means of doing it, except that it should be by the railroad of the Hudson River Company.

The authority thus to be construed, was to deliver the mirror to the railroad company for transportation. A delivery to a carrier for transportation imports an acceptance by the carrier for that purpose. (Redfield on Carriers, § 95 and following.) The consent of the carrier to receive is as necessary to the completion of a delivery, as is the consent of a grantee in a deed to the delivery of the deed. In neither case can the obligation or the advantage be thrust upon a person without his assent. An authority to deliver for transportation could only be executed by obtaining the consent of the carrier to receive the same. A carrier is not liable for the value of property until he has received the same for transportation, either in fact or in construction of law. If he arbitrarily and illegally refuses to accept the property he may be liable in damages for a breach of his duty, but not as a carrier for the value. (39 N. Y. R., 34.)

Kimball & Co. were authorized, then, to carry this mirror to the starting point of the Hudson River road, and to procure its acceptance by that road for the purpose of being transported to Fulton. This authority must be construed to include all the necessary and usual means of carrying it into effect. In Redfield on the Law of Railways it is said : "As a general rule, the agent to whom the owner intrusts the goods for delivery must be regarded as having authority to stipulate for the terms of transportation." (1 Red. Railways, 22, citing *London* v. *N. W. R. W. Co.*, 7 H. & N., 600; *Lewis* v. *G. W. R. W.*, 5 id., 867.) This is in accordance with the general principle. Numerous instances of this character are collected in Story on Agency. Thus, a general authority to collect, receive and pay debts, will authorize settling accounts, adjusting disputed claims, resisting unjust claims, answering or defending suits, as incident to and included in the primary power. (§ 58.) An authority to collect a debt will authorize an arrest of the debtor. An authority to a broker to effect a policy will authorize him to adjust a loss, and to adopt all necessary means to procure an adjustment. An authority to settle losses

on a policy will include a power to refer the matter to arbitration. An authority to sell and convey lands for cash includes an authority to receive the purchase-money. (Id.) An agent who is employed to procure a note to be discounted may, unless expressly restricted, indorse it in the name of his employer, or he may indorse it in his own name, and claim indemnity of his principal. A servant or agent employed to sell, without express restriction as to mode, may sell by sample or with warranty. (§ 59.) Such an authority also includes not only the means necessary and proper, but all the various means which are justified by the usage of trade, thus authorizing a sale upon credit when that mode of sale is justified by the usage of trade. (§ 60.) In other words, the agent is clothed with full authority to use all the usual and appropriate means to accomplish the end, unless a more restricted authority is established. (§§ 73, 102, 103.)

These principles amply justify the authority to make the contract in question by Kimball & Whittemore on behalf of the plaintiff. They were directed to deliver the mirror to the carrier. This required them to procure an acceptance of the article by the company. They were directed in effect to procure "its transportation to Fulton by the railroad company." This could only be accomplished by entering into a contract that it should be transported upon an open carriage, where it was exposed to unusual hazard of injury, and upon specified terms of liability. The mirror must remain uncarried by the Hudson River Company, or this arrangement must be made. The plaintiff's authority was general, and was unrestricted. In my judgment, the contract made, to wit, that it might be shipped upon an open carriage, and that the carrier should not be responsible for any breakage thereof, was within the agent's authority, and is obligatory upon the plaintiff.

It is said in further objection to the right of recovery, that the agreement was without consideration, and for that reason is void. This argument is based upon that section of the statute (§ 36, Laws 1850, chap. 140) which makes it the duty of a railroad company to receive and transport property " on the due

payment of the freight or fare legally authorized therefor."
They were bound, it is said, to carry it, and there is nothing
to show that the defendant could or would have charged a
higher price if the property had been transported in a covered
carriage. This argument is based upon the assumption that
the defendant was bound to carry this mirror at a rate or
price fixed by law, and that the law fixed their liability,
founded upon that rate or price. I do not understand that
either of these assumptions are well founded. The statute
fixes no rate of fare, either for mirrors or non-perishable pro-
perty; for goods carried in covered cars or in open cars. The
whole thing is a matter of contract. The company can fix
any reasonable rates they think proper, and vary them at
pleasure. They received the mirror in question for transport-
ation over their road; they were bound so to transport it; if
they failed to deliver it uninjured, they were liable, or not,
according as the injury was or was not the result of causes for
which they agreed to be liable. The undertaking to carry
was the consideration for the agreement of the shipper, as
the liability of the shipper to pay the freight was the con-
sideration for the agreement of the carrier to transport.
There was a mutual and sufficient consideration; the same
that exists in the ordinary case of shipment of goods with or
without a special contract.

Without intending to weaken any other ground of defence,
by not alluding to it, I am content to place my judgment
upon the grounds stated. The plaintiff recovered the full
value of his mirror, notwithstanding the injury to it accrued
from a cause for which it was expressly stipulated that the
defendant should not be liable. This was error.

There should be a new trial, with costs to abide the event.

Earl, C. It is not very important, as I view this case, to
determine whether the consignee of goods is, in the absence
of any other indication of ownership, to be presumed the
owner of the goods shipped. It was held that he was, by one
of the learned judges, who wrote the opinion at the General

Term, in this case.  And such was the dictum of Judge JAMES, in *Sweet* v. *Barney* (23 N. Y., 335), and of Ch. J. BRONSON, in *Price* v. *Powell* (3 Com., 322); and by the same learned judge, in *Everett* v. *Saltus* (15 Wend., 474).  But in *York Company* v. *Central Railroad* (3 Wal., 107), Mr. Justice FIELD held that the consignors, who were in that case not the ·owners of the property shipped, but the mere agents of the consignees, were to be treated as the owners.

Whether the consignor or the consignee is to be presumed, in the absence of proof, to be the owner of the goods shipped, for the purpose of determining the rights and liabilities of the carrier to the real owner, it cannot well be disputed that the consignor of goods to a distant owner as consignee, must be treated as the agent of the consignee, for the purpose of shipping and consigning the goods, as the consignee of a distant owner who is the consignor is the agent of the latter to receive the goods consigned to him.  No other rule would be found practicable or convenient in the extensive commerce of our country, carried on through the agency of common carriers.  It was so held in *London and North-Western Rail-Railway* v. *Bartlett* (7 H. & N., 400)·  In Redfield on Carriers, section 52, the learned author says: "As a general rule, the agent to whom the owner entrusts the goods for delivery must be regarded as having authority to stipulate for the terms of transportation.  By this we do not mean the porter or cabman, or mere servant, but the consignor of the goods, or any other agent of the owner, who purchases or procures them for him."  In *York Company* v. *Central Railroad* (*supra*), Trout & Son shipped at Memphis, on the Mississippi, a large quantity of cotton on board a steamer belonging to the Illinois Central Railroad Company, which, by the terms of the bill of lading, was to be delivered at Boston, Massachusetts, the consignees, the York Company, paying freight, "fire and the unavoidable dangers of the river only excepted."  In the course of the transit, the cotton was destroyed by fire, and the York Company sued the carriers in the United States Circuit Court for damages.  It

appeared that Trout & Son were the agents of the company, and that the latter owned the cotton. The defendant had judgment. On error in the Supreme Court, it was objected that the exemption from liability specified in the bill of lading did not bind the plaintiff, because Trout & Son, who were merely agents of the York Company, could not give their assent to such exemption, so as to bind the company; and because, further, there was no consideration for such exemption. Both grounds of objection were considered by the court, and held not to be available. It was held that the consignees were bound by the contract made by the consignors as their agents. The objection of a want of consideration was answered by Mr. Justice FIELD as follows: "There is no evidence that a consideration was not given for the stipulation. The company probably had rates of charges in proportion to the risks they assumed from the nature of the goods carried, and the exception of losses by fire must necessarily have affected the compensation demanded." There was in the case no proof of a reduced compensation for the carriage on account of the exemption from the risks specified; but the court, in the absence of any proof to the contrary, presumed that there was such a reduction. In the case of *Squire* v. *New York Central Railroad Company* (98 Mass., 239), the plaintiffs bought hogs in Chicago, and sent a drover to attend and take care of them to Boston. At Suspension Bridge, on the route, they were discharged into the stock-yard of the railroad company; cars were brought to the yard and the hogs loaded into them. The ticket master gave the drover a pass and handed to him at the same time a written contract, saying that he must sign it, and asked him to sign it with the name of the plaintiffs, which he did, without express authority from them. The contract was also signed by the station agent and limited the liability of the railroad company in several important particulars, and, among other things, exempted the company from injury to the hogs from suffocation. Some of the hogs were suffocated before reaching Albany, and, in an action by the owners to

recover their value, it was held that the contract was binding upon them, and that the company was not liable.   GRAY, J., says: "That even if the drover had no express authority from the plaintiffs to sign any contract relating to their transportation, he was the person in charge of the property, and the only one with whom the defendants could make the necessary arrangements, and stood toward them for this purpose in the position of an owner."   See also *Christenson* v. *American Express Co.* (15 Minn. 270).

In the case under consideration the plaintiff bought the mirror of Kimball, Whittemore & Co., and paid them therefor $195, and also paid them five dollars for boxing and shipping it, and directed them to deliver it to the railroad company for transportation to him, and gave them no other authority. They thus became the consignors of the mirror, and the agents of the plaintiff for shipping and consigning the same, with all the powers and authority incident to such an agency.   The agency was not limited by any instructions of the principal, and hence the agents were general agents in the particular business, possessing all the implied power requisite to do the business in any of the ordinary and customary modes.   (*Anderson* v. *Coonley*, 21 Wend., 279; *Jeffrey* v. *Bigelow*, 13 id., 518.)   Within such limits they stood in the place of the principal, and according to the cases above cited from 3 Wallace and 98 Mass. could be treated with by the carrier as owners.

It appeared that the defendant had for a long time been accustomed to refuse to receive or carry, at its ordinary tariff, large mirrors too bulky to be carried in covered cars, and for that reason liable to extra hazards, unless and until the shippers thereof would execute and deliver a release of liability similar to the release which was executed in this case, and that this custom was well known to the consignors.   It matters not that this custom was not known to the plaintiff.   It was proper that it should appear, and is important only to show that the alleged contract of shipment was an ordinary and usual one to be made upon the shipment of such property, and hence that it was within the

implied authority confided to the consignors by the plaintiff. Hence, I reach the conclusion that the consignors had an implied authority to make the alleged contract; and the next question to be considered is, whether they did in fact make it on behalf of the plaintiff.

The consignors, as above stated, knew that it was usual for the railroad company to exact such a contract and to charge special rates if it was not made. When their cartman delivered the mirror to the company for transportation, it was found to be too bulky to be carried in a covered car and the railroad agent refused to receive it unless the cartman would first sign the contract. Thereupon he, knowing the custom in such cases, signed the contract as "agent for shipper and owner." The railroad agent also signed the same and delivered a copy thereof to the cartman, and it was agreed that the box containing the mirror should be retained in the railroad depot till the next day and should be returned to the consignors if they requested it. The cartman gave the copy of the contract to the consignors and stated to them all the above facts. The contract itself specified that if any objection was made to it, notice was to be given to the freight agent, that a new contract might be made. The consignors did not before the next day request the return of the box or communicate to the defendant's agent any dissent from the arrangement, and the defendant therefore forwarded the box. The cartman was not authorized to make this contract. He was merely the servant of the consignors to deliver this box to the railroad, and was clothed with no discretion to act for them. No authority could be implied from his character and business, and his principals were near at hand, where they could be consulted, and they could act for themselves. But he assumed to act for them and to do what they were authorized to do. They were notified of all the facts, and the contract made by him for them was delivered to them. They were informed that if they had any objection to the contract made by their assumed agent, they should notify the defendant the next day. They made no objection, and expressed no dis-

satisfaction with the contract, leaving the defendant's agent to suppose that it was satisfactory to them. It seems to me that these facts constitute a most emphatic and unequivocal ratification of the contract. A subsequent ratification, with knowledge of the facts, of the acts of an assumed agent, is equivalent to an original authority and as this was a contract which the consignors could have deputed the cartman to make for them, it must be treated as if made by them in person and binding upon the plaintiff. We have, then, this contract exempting the defendant from the very risk (breaking) which caused the damage complained of. It cannot be claimed that the contract was illegal because it limited the liability of the defendant as a common carrier, for such contracts are tolerated by the law. It cannot be condemned as extorted from the consignors by the defendant in violation of its duty as a common carrier, because the contract was voluntarily made by them. They had the option either to insist that the defendant should transport the box, without any special contract, subject to the duty and responsibility imposed by law, or to make a special contract for the carriage. They voluntarily chose the latter, and the contract is binding if founded upon a sufficient consideration, and whether it was or not will now be considered.

There is no law regulating the amount of freight which railroad companies may properly charge. They are bound to carry such property as may be offered to them for transportation, upon due payment of freight. They must carry for all upon equal terms, charging one no more than another for freight or property delivered under like circumstances. But they are not bound to carry all kinds of property for the same freight. They may charge ordinary rates for some kinds of property exposed in the carriage to ordinary hazards, and extra rates for property exposed to extra hazards. As railroad companies are *bound* to carry without any contract limiting their liability, their mere agreement to carry does not furnish a consideration for the agreement to limit their liability; nor does their agreement to carry for the price which

they would be authorized to charge in case their liability was not limited. (*Bissell* v. *The N. Y. C. R. R. Co.*, 25 N. Y., 442.) But it is a sufficient consideration if they agree to carry for a reduced compensation because their liability is limited. In *York Company* v. *Central Railroad* (*supra*) it was held that where there was an agreement limiting the liability of the carrier, it would be presumed, in the absence of proof to the contrary, that it was upon the consideration of a reduced compensation for the carriage. Such a presumption is not unreasonable, but it is not necessary to indulge in it in this case. Here the consideration of the restricted liability was not simply the agreement of the defendant to *carry*, but to carry at " tariff rates." This was a consideration satisfactory to the parties. How can we say, in the absence of proof, that " tariff rates " meant the full rate which could be charged for freight upon the mirror? In view of all the facts and circumstances disclosed, it is clear that " tariff rates " meant a less rate than the defendant was authorized to charge for the carriage of mirrors and other articles exposed to extra hazard. Here, then, the consideration for the agreement to limit the defendant's liability was the agreement to carry for a reduced compensation, and we reach the conclusion that the contract was a valid, binding contract between the plaintiff and the defendant.

The only further question to be considered is whether the defendant discharged its duty under the contract. The receipt given by defendant's freight agent, at the time of the execution of the above mentioned contract and the delivery of the box, is as follows: " Received from Kimball, Whittemore & Co., in good order, on board the N. Y. C. R. R., for Fulton, N. Y., the following package: One box, mirror, marked W. S. Nelson, Fulton, N. Y." There is an evident mistake in this receipt. The box was not received on board the New York Central railroad, or on board of any other road. It was received at the depot of the defendant in New York, to be carried over its road, connecting with the New York Central railroad at Troy. Some words are manifestly omitted,

and the receipt should probably have stated that the box was received to be delivered on board the New York Central railroad. It must be read as if some such words were contained in it, and it must be construed in connection with the contract executed at the same time. The two instruments together show clearly that the defendant undertook the duty of an intermediate carrier, to take the box and carry it to Troy, the terminus of its route, and there to deliver it on board of the New York Central railroad. There is nothing, either in the two instruments or in the circumstances surrounding the transaction, from which we can infer that the defendant undertook to carry the box to Fulton, far beyond the terminus of its road. Hence, the defendant discharged its duty when it carried this box to Troy and tendered it for carriage to the New York Central Railroad Company. Upon the refusal of the latter company to receive and carry it, it should have notified the plaintiff of such refusal. But as the neglect to notify the plaintiff caused him no damage, it is of no consequence in this action.

Having thus carefully examined the important questions raised and discussed in this case, I have reached the conclusion that the plaintiff was not entitled to recover, and the judgment must be reversed and new trial granted, costs to abide event.

All concur.

Judgment reversed.