## THE ST. HUBERT.

(District Court, E. D. Pennsylvania.   May 21, 1900.)

No. 23 of 1898.

1. SHIPPING—AUTHORITY OF SHIPPER'S AGENT TO MAKE CONTRACT—BILLS OF LADING ON TRANSSHIPMENT.

The foreign agents of an owner of merchandise, authorized to ship the goods, also have implied authority, generally speaking, to agree upon the terms of the contract of carriage; and where they know that transshipment is necessary they may lawfully empower the first carrier to deliver the goods to a connecting carrier upon terms that are not the same as those of the first bill of lading.   Where, in such case, the goods are shipped on through bills of lading which authorize the initial carrier to transship and forward by steamer, "subject to the terms and conditions of local bills of lading issued by the agents of such steamer," or contain other equivalent provisions, the owners of the goods are bound by the provisions of bills of lading issued by the connecting carrier to the first carrier therefor on their transshipment, so far as such provisions are lawful and enforceable.

2. SAME—DAMAGE TO CARGO—CONDITION OF BILL OF LADING REQUIRING NOTICE OF CLAIM.

A provision of a bill of lading that "the shipowner is not to be liable * * * for any claim, notice of which is not given before the removal of the goods," even if conceded to be unreasonable and void as to the time within which it requires the notice to be given, is valid, and will be enforced to the extent of requiring notice to be given, and it must be given within a reasonable time, or the right to recover on a claim for damage to the goods will be barred.

In Admiralty.   Suit to recover for damage to goods in shipment.

Francis S. Laws and John F. Lewis, for libelant.

Convers & Kirlin and George W. Betts, Jr., for respondents.

McPHERSON, District Judge.   In July, 1897, Stanley & Co., of Calcutta, acting as agents for Cooper, Smith & Co., of Philadelphia, who were the owners of the goods, shipped 65 bales of goat skins on board the steamships Palawan and City of Sparta; 40 bales going by the Palawan, and 25 by the Sparta.   The Palawan was a vessel of the Peninsular & Oriental Steam Navigation Company, and the Sparta was a vessel of the City Line, neither line carrying goods further than the port of London.   The skins were shipped upon through bills of lading, and were to be delivered "unto order * * * at the port of Philadelphia."   The bales were transshipped at London, and were carried across the Atlantic by the steamship St. Hubert, of the Johnston Line.   Upon their arrival in Philadelphia early in October, they were found to be damaged to some extent by water.   The Insurance Company of North America, the underwriter of the skins, paid the amount of damage, and brings this action against the St. Hubert, alleging that the goods were injured by the negligence of the ship. Several defenses are set up by the respondent, but, in the view I take of the case, only one defense need be considered.

It cannot be doubted that Stanley & Co., at Calcutta, and Cooper, Smith & Co., at Philadelphia, both knew that the goods would be transshipped.   Such knowledge appears clearly from the evidence, and I do not understand the fact to be denied.   It is enough to note

—although there is other evidence on the subject—that the orders for insurance given by Cooper, Smith & Co. to the insurance company on August 26th, September 3d, and October 6th expressly state that there is to be "transshipment via London," or "transshipment via port or ports." As already stated, transshipment was made at London by the original carriers, and bills of lading were issued to them by the St. Hubert, in which are contained certain limitations upon the carrier's liability that are not found in the Calcutta bills. One of these limitations is a provision that "the shipowner is not to be liable ＊ ＊ ＊ for any claim, notice of which is not given before the removal of the goods," and, as no such claim was ever made by Cooper, Smith & Co., or was made by the insurance company for several months after the skins were removed, the St. Hubert sets up this provision as a complete defense. To this the libelant makes two replies: First, that the consignees were not bound by the St. Hubert's bills of lading, in so far as they differ from the bills issued at Calcutta,—the contention being that, as the provision concerning notice of claim is not in the original bills, it formed no part of the contract of carriage; and, second, that, even if the provision is now to be considered, it is unreasonable, and altogether void. In my opinion, neither reply is sufficient.

With regard to the first, it may be observed that the original shipment was not made by Cooper, Smith & Co. in person. The contract was made by their agents, and not by themselves; but its validity is nevertheless unquestionable. The agents had authority to ship the goods, and therefore they had authority also (speaking generally) to agree upon the terms of the contract of carriage, subject, of course, to have such terms reviewed by any court before which they might subsequently come for consideration. Could these agents in Calcutta, knowing that transshipment was necessary, lawfully empower (either expressly or impliedly) the first carrier to deliver the goods to the connecting carrier upon terms that are not to be found in the first bill of lading? I think it is clear that the agents could thus empower the original transporter. Indeed, it may be doubted whether the first carrier needs any such authority from the consignor. It may be that the power of the first carrier to accept from the second carrier a bill of lading containing the terms upon which alone the latter will continue the transportation is of necessity a part of the first carrier's obligation to forward at the end of his own line. The first carrier is under a duty to forward even if he does not expressly so agree, and he cannot discharge this duty unless he is able freely to contract with the carrier whose line is next to undertake the movement of the goods. The first carrier cannot impose the terms of the original contract upon the connecting line. The conditions of the respective services to be rendered may differ so much that identical contracts would be unreasonable; but, in any case, as (according to the modern authorities) each carrier is able to limit his liability in such directions as he may see proper, subject to certain restrictions upon the right, it is clear that neither the shipper nor the original carrier has the power to prescribe to the second carrier the terms upon which the carriage is to be continued. To say that the first bill

of lading binds the second carrier is to require him to submit to a contract concerning which he was not consulted, and to which he did not agree. But, even if the first carrier is to be regarded as without power to accept a bill of lading from the second carrier, unless the owner of the goods confers an express or implied authority thus to accept, I see no reason to doubt that an agent making a shipment upon a through bill of lading is able to give to the first carrier all the authority concerning the terms of transshipment that the owner himself could have given. Cooper, Smith & Co., if personally present at Calcutta, could certainly have authorized the Palawan and the Sparta to agree to the transatlantic bills of lading; and there is nothing in the case to show that Stanley & Co. were not completely the representatives of Cooper, Smith & Co. for the same purpose. No limitation upon the agents' authority is proved, and I think none is implied by the course of business. On the contrary, it seems to me that the interests of commerce require that (in the absence of evidence showing his power to be restricted) an agent for the shipment of goods should be able to contract for their transportation in the same manner and to the same extent as the owner might contract, and that the owner should be bound by the agent's agreement in this regard. For authorities bearing upon the preceding paragraph, see Hutch. Carr. § 108, and the cases cited in 2 Am. & Eng. Enc. Law (2d Ed.) 306.

What contract, then, did Stanley & Co. make in Calcutta concerning the transshipment of the goods in question? Turning to the through bills of lading, the answer is as follows: The Sparta bill contains these clauses: "To be transshipped or landed at London (with liberty to warehouse there), and from London to be forwarded by steamer at the risk of the shipper, but at ship's expense, and to be delivered, subject to the exceptions and conditions at the foot hereof, in the like good order and condition at the port of Philadelphia. * * * The owners are to be at liberty to carry the said goods to their port of destination by the above or other steamer or steamers, ship or ships, proceeding either directly or indirectly to such port, and to transship or land and store the goods, either on shore or afloat, and reship and forward the same at the owner's expense, but at merchant's risk." And, in addition, the following special clause: "The goods to be carried to Philadelphia, subject to the terms and conditions of local bills of lading issued by the agents of such steamer or steamers." The bill of lading also contains this note: "N. B. Inquiries respecting this cargo transshipped at London to be addressed to Messrs. Montgomerie & Workman, 36 Grace Church St., London, E. C."

The Palawan bills are quite as clear concerning the power to transship. The goods were to be delivered at Philadelphia "via London," and "the company are to be at liberty to carry the said goods to their port of destination by the above or other steamer or steamers, ship or ships, either belonging to the company or to other persons, proceeding either directly or indirectly to such port, and in so doing to carry the goods beyond their port of destination, and to transship to land and store the goods either on shore or afloat, and reship and

forward the same at the company's expense, but at merchant's risk. In cases where the ultimate destination at which the company may have engaged to deliver goods is other than the steamer's port of discharge, the company reserve the right to forward such goods by rail. The company act as forwarding agents only from that port, and in all cases their liability is to cease as above provided." The Palawan bills do not contain the special clause found in the Sparta contract, but (as already said) I think the authority to agree to the terms of the second carrier's bill of lading is necessarily implied therein.

The first carriers were each under obligation to transship at London for the Atlantic voyage, and each was as fully the agent of the consignees for this purpose as were Stanley & Co. when the shipment was originally made at Calcutta. The Johnston Line was an independent carrier, under no duty to receive goods except upon its own terms; and therefore, if the forwarding carrier had no authority to agree to the St. Hubert's bill of lading because it differed from the Calcutta bills, nothing could be done except to store the goods until a steamship could be found that would receive them on the precise terms contained in those bills, or until the owner should give order concerning their disposal. I need scarcely say that such a result is out of the question, especially since no consignee was named in the through bills of lading, and it would have been difficult to learn who had become the owners of the goods. Without prolonging the discussion, my conclusions are these: The first carrier, under the through bills of lading in question, was bound to forward by the next succeeding carrier, and had authority to agree to the latter's terms of shipment. For this purpose the first carrier was the consignees' agent, and the consignees were bound by the agreement with the St. Hubert, even although they did not know of its terms at the time when it was made. Cooper, Smith & Co. were bound by the contracts made in Calcutta by Stanley & Co. as consigning agents before they knew what terms were contained therein, and they were equally bound by the terms of the London contract, made in that city by their carrying agents. That they did come to know of the Calcutta contracts, including the agreement concerning transshipment, is apparent; and that they also came to know of the transshipment by the St. Hubert appears from the orders for insurance, in which the St. Hubert's name is given as the vessel that is to bring the goods forward to Philadelphia. The consignees could have obtained a copy of the Atlantic bill of lading without difficulty from the Philadelphia agents of the Johnston Line, although the original bill remained, of course, in the hands of the first carrier. The ship's copy would also be available upon the arrival of the vessel, and the consignees' banking agents in London— by whom the through bills were forwarded—could have been instructed to obtain copies of the Atlantic bills. In my opinion, therefore, the consignees were bound by the conditions of the St. Hubert's bill, so far as they may be enforceable in the federal courts.

This brings me to the second reply to the steamship's defense, namely, that the requirement concerning notice is unreasonable, and altogether void. I am unable to agree to this proposition.

Precisely what may be the scope of the requirement—just what may be meant by the phrase "before removal of the goods"—it is unnecessary to determine now. The libelant's construction is that this phrase, in connection with other provisions of the bill, means removal from the ship, and, as this would require a claim to be made before the consignees could see and examine the goods, the provision is attacked as unreasonable. I doubt the correctness of this construction,—remembering the rule that limitations upon the carrier's liability are to be construed in favor of the shipper or the consignee,—but, in any event, even if it be assumed for present purposes that the time limitation is so unreasonable that a court would not enforce it, the result would merely be that the limitation would fall, while the provision for notice would still remain, to be complied with before the expiration of a reasonable time. The courts have often upheld conditions requiring notice of similar claims to be given, and the reason for sustaining the condition is that the carrier, or insurer, or telegraph company should have an opportunity to inquire into the circumstances and amount of the loss at a time when inquiry may be of service. A number of cases are collected in the note to Capehart v. Railroad Co., 31 Am. Rep. 509, and in 5 Am. & Eng. Enc. Law (2d Ed.) 321. This being the reason for supporting the requirement, it would be most unfair if, where a limitation had been found unduly short, and therefore invalid, the claimant might still delay giving notice of his claim until the last day allowed by law for bringing a suit. I think the proper rule should be that, where there is a provision for notice of claim without limiting the time within which the notice must be given,—and, of course, the limitation no longer exists after a court has set it aside,—the requirement for notice still remains, and that such notice must be given within a reasonable period. In the present case the period was not reasonable, three more voyages having been made before any claim was presented.

If this view of the case is correct, it is decisive of the controversy, and the remaining questions—concerning the law of the flag, the Harter act, the provision with regard to insurance upon the goods, and the cause of the damage—need not be considered.

The libel must be dismissed, at the costs of the libelant.