## THE GRAN CANARIA, etc.

*(District Court, S. D. New York. June 8, 1883.)*

1. CONTRACT OF AFFREIGHTMENT—CARRIAGE OF GOODS.

    Upon an ordinary contract of affreightment a vessel is bound to carry goods under deck, and is responsible for any loss of goods carried on deck without the owner's consent.

2. SAME—"ON DECK."

    Upon such a contract, where a bill of lading was given with the words "on deck" written in red ink by the agents of the vessel, and the goods were carried on deck, and necessarily jettisoned on the voyage, *held*, upon conflicting testimony, that the words "on deck" were written in after the bills of lading had been submitted to the libelant's correspondents in New York, who attended to the shipping of the goods, and without their assent or the assent of the libelant; and that the vessel was liable for the loss.

3. SAME—MODIFICATION.

    *Held, also*, that the libelant's correspondents in New York, who shipped the goods, had no authority, or apparent authority, to modify the contract of affreightment so as to permit carriage of the goods on deck.

4. SAME—CUSTOM.

    It being claimed that by custom the owners of the vessel had a right, under such a contract, to carry the goods on deck by submitting to a charge for the extra insurance, and giving a rebate for difference of freight, *held*, that the custom was not sufficiently established by proof, and if proved would be invalid and illegal, as unreasonable and in conflict with the terms of the contract.

In Admiralty.

*Butler, Stillman & Hubbard*, for libelant.

*A. O. Salter* and *R. D. Benedict*, for claimants.

BROWN, J. The libel in this case was filed to recover for the loss of 48 out of 50 barrels of linseed oil, which were carried on deck of the Gran Canaria on a voyage from New York to Santa Cruz, in March, 1880, and lost by necessary jettison during the voyage. The right of recovery depends upon two principal questions: *First,* whether carrying the oil on deck was allowable under the original contract with the master of the vessel; and if not, then, *second,* whether the terms of the original contract were so modified or waived as to relieve the vessel from responsibility for having carried the oil on deck. The libelant entered into a written contract with the master of the Gran Canaria, dated January 20, 1880, whereby the vessel contracted to carry cargo from New York to Santa Cruz, Teneriffe, to the amount of not less than 200 tons, at the rate of of six dollars per ton, for which the vessel "bound herself, her freight, hull, and the merchandise on board." The libelant was engaged in business at Vera Cruz and resided there, and after making this contract of affreightment sent an order to Yates & Porterfield, his correspondents in New York, to purchase for his account a variety of goods, including 50 barrels of oil, and to ship the same upon the Gran Canaria under the contract, a copy of which he inclosed. The goods, including the oil, were accordingly purchased, sent to the ship, and received aboard on libelant's account as a part of the shipment contracted for. The gross amount of tonnage thus shipped corresponded very closely with the 200 tons provided for in the contract, the oil constituting about —— tons thereof.

The bill of lading given for the goods, dated March 19th, is found to have written in the body of it the words "on deck," in red ink, next to a stamped clause in fainter red ink; the rest of the body of the bill of lading being written in black ink. The respondents claim that this bill of lading was accepted by Messrs. Yates & Porterfield, knowing that the goods were to be thus carried on deck, and that the libelant is, therefore, precluded from any claim on the vessel for the loss. Messrs. Yates & Porterfield contend that the words "on deck" were inserted without their knowledge or assent, and that they did not know of it till long afterwards. The bill of lading was not received by the libelant at Santa Cruz till the arrival of the ship. He protested against the carriage on deck and the loss; and, by reason of the goods being on deck, his insurers refused to hold themselves liable. The care of shipping the goods was intrusted to Mr. Geyer, a clerk in the employ of Yates & Porterfield, who, after the delivery of the goods on board and the receipt of the usual shipping receipt therefor, made a draft of the bills of lading and sent them to Durand

& Co., the agents of the vessel, for signature by the master. They were sent back the following day to Mr. Geyer with the freight extended in the margin, and some other particulars which had been added by the agents of the vessel, which Mr. Geyer deemed objectionable, and they were accordingly again sent to Mr. Durand with a statement of the objections. Thereupon a second set of bills of lading were drawn up by Mr. Durand in accordance with the terms requested by Mr. Geyer, the margin being in red ink, and a stamped clause in red ink being in the body, and both sets were again sent to Mr. Geyer for examination and approval. Mr. Geyer objected to the stamped clause, and there being other objections relating to other goods, all the bills of lading were again sent to Durand & Co. On the same or following day Mr. Geyer called at the office of Durand & Co. and received the bills of lading, after seeing a line drawn through the stamped clause objected to, and shortly afterwards forwarded them to the libelant at Santa Cruz. No reference in their letter was made to the goods being on deck, and it was some time before the libelant learned the version of the matter given by Yates & Porterfield and their clerk, Mr. Geyer, so that it was about a year after the shipment before the vessel was libeled for the claim now in suit.

Mr. Geyer, in his testimony, is very explicit and positive that in no way whatsoever was his attention called to the words "on deck," inserted by the agents of the vessel, and that he had no knowledge whatever that the vessel designed to carry them on deck. The members of the firm had little to do with the matter, and had no knowledge of these words in the bill of lading. Mr. Geyer testifies that when the two sets of bills of lading were sent to him he carefully compared them with an assistant, reading himself the one he had first drafted, and that the words "on deck" were not then there. A clerk of Mr. Durand, on the contrary, testifies that he had himself written the words "on deck" in the first bill of lading before it was first returned to Mr. Geyer and before it was copied into the second set, and that these words were in both sets when afterwards sent together to Mr. Geyer. One circumstance, however, tends to corroborate the probability that the words "on deck" were not in the first bill, viz., that these words are not in the same handwriting with the other red-ink words copied from the first bill into the second. When the first, having been corrected, was handed to a copyist, as one of the clerks of Mr. Durand testifies, to copy for a second set, it seems very unlikely that if the words "on deck" were then on the first bill,

it would have been omitted by the copyist in making the copy therefrom for a second set; and as those words were inserted in the second set after that was copied from the first, and in another hand, the inference is strong that they were then placed there for the first time, and were never in the first set at all. The first set having been afterwards destroyed by the respondents, there is now no means of ascertaining the fact with certainty. The same inference is strengthened by what is testified to have taken place at the time of Mr. Geyer's last call, when the bills of lading were finally delivered to him. One of the clerks inside of the office who had the bills testifies that, hearing Mr. Geyer's voice, he gave the bills to his father for delivery to Mr. Geyer, and that he then suggested to his father to call Mr. Geyer's attention to the words "on deck;" not a very probable circumstance if these words had been inserted before the bills had been sent from the office of Durand & Co. to Geyer, to be compared by him.

Mr. Durand, Sr., testifies that when he finally delivered the bills to Mr. Geyer he told him the goods were carried "on deck," and called his attention to these words; that Mr. Geyer objected to this; and that he was told in reply that it could not be helped, and all he had to do was to send them a bill for the extra insurance and for a proper deduction of freight. Mr. Geyer explicitly denies that there was anything of this character stated to him; but testifies that Mr. Durand only said to him, "There are your bills of lading, just as you wanted;" that he saw Mr. Durand draw his pen through the stamped clause objected to; and that having previously carefully read and compared the bills, as above stated, he had no idea that any further change in them would be made, and therefore did not read them again, and sent one copy to the libelant, not knowing that it contained the words "on deck."

In this conflict of testimony between witnesses, whose general integrity and credibility are equal and unquestioned, I must be guided by the probabilities of the case, as indicated by the acts of the parties and the liabilities of either to mistake in their testimony. The attention of the respondents was not called to this subject until nearly a year after the occurrence. It appears that there were several other consignors whose goods it was proposed to carry on deck, and that when some of them objected their goods were put below. When, a year afterwards, Messrs. Durand & Co. heard of the difficulty about the oil being on deck, it is not at all impossible that they might misremember the particular person with whom the conversation above stated by Mr. Durand, Sr., took place, and mistakenly think it was

with Mr. Geyer, instead of some one of the other consignors who objected to their goods going on deck. It would seem scarcely probable that minute details of the character above given should be accurately remembered by persons who were having many similar transactions, unless there was something peculiar to impress it upon the mind.

On the other hand, if Mr. Geyer was told the goods were going on deck; if he objected thereto; and was then told that all he had to do was to send in his bill for extra insurance and deduction of freight,—it is scarcely credible that, familiar as he was with shipping and with the nature of insurance risks, he should neither have procured any insurance to cover this risk of goods on deck, nor informed the libelant of the circumstance, nor even sent in to Durand & Co. any bill for such extra insurance and freight. Had the circumstances otherwise indicated a careless habit of business on his part, this might be set down to forgetfulness or negligence; but the circumstances show Mr. Geyer to have been in this business most active, zealous, and careful of the libelant's interests in all other respects. It therefore seems to me highly improbable that Mr. Durand had the conversation which he testifies to with Mr. Geyer, but that it was with one of the other shippers. It is also to be noted that this alleged conversation with Mr. Geyer would not naturally have occurred in that way if both sets of bills of lading had the words "on deck" in them when previously sent to Mr. Geyer's office; certainly not if these words had been noticed by him; for the objection would then obviously have been sooner made, when the other items were objected to.

On the whole evidence and the probabilities of the case I am therefore satisfied that at none of the several times when the bills were sent for examination to Mr. Geyer's office, did they have the words "on deck" written on them, and that Mr. Geyer's attention was not called thereto when he took them as above stated, and that he did not know that they had been inserted when he received them and sent them to the libelants. The words, though in red ink, were in a small hand, and amid the considerable other matter written on the bill would not attract attention on a mere cursory inspection, and would easily be overlooked, except upon a deliberate examination of the whole bill, such as was not incumbent on Geyer to make again, or reasonably to be expected after having been sent to him for examination, and corrected and returned by him with specific objections, and approval of all the rest.

Under the original contract of affreightment the vessel was legally bound to carry these goods under her decks. By the marine ordi-

nance of Louis XIV., § 16, art. 12, it is declared no master shall lade any goods upon the ship's deck without the order or consent of his merchants, under pain of being answerable for all the damage that may happen; and such is the general law. 1 Pars. Mar. Law, 266, 267; *The Paragon*, 1 Ware, 322. Mr. Durand, Sr., testified that under such a contract he considered the vessel had a right to carry on deck at her own option, making a deduction in freight and paying the extra insurance, and some evidence of such a custom was given. Other witnesses, however, denied this. It is impossible to sustain any such claim of legal right, or any such alleged custom, even if sufficiently proved, for it is manifestly contrary to the contract of the parties. It would turn a contract for the carriage of goods under the ordinary conditions of safety, and upon a specified freight, into a dangerous venture of the goods on deck, at a different rate of freight, and with a rebate for extra insurance to cover the liability of a loss of the goods which was likely to result, giving the merchant, not the goods he bargained to have delivered in the port of discharge for use in his business, but simply insurance money in place of his goods. No option or custom which would thus vary an express contract can be sustained.

Nor had the vessel any right to issue a bill of lading for the goods on any different terms from the legal import of the contract of affreightment, except with the libelant's consent. The goods were bought and put aboard under that contract by which the vessel had bound herself to carry and deliver them according to the terms of the contract. While the bill of lading was a convenient voucher, it was in no way essential under the express contract; and the terms of the carriage of the goods, or the liability of the vessel under the contract, could not be altered without the assent of the libelant or his duly-authorized agent. There is no evidence, and, so far as I can see, no circumstances tending to show, that Messrs. Yates & Porterfield, or Mr. Geyer, had any authority to vary the terms of the contract, or to assent to the carriage on deck, so as to bind the libelant. The contract had been sent to them; the goods were shipped under it; there was nothing to indicate to the agents of the vessel that Messrs. Yates & Porterfield had any right to make any new or different contract so as to bind the libelant. The vessel might have refused to receive the goods at all; but she could not receive them under the contract and then refuse to be bound by its legal obligations, except by a change of its terms by the libelant's authority. Mr. Geyer or Messrs Yates & Porterfield had no such authority. But from the

conversation testified to by Mr. Durand, Sr., as well as by his claim of right, as stated by him, it is evident that the agents of the vessel did not even seek to make any new contract, or to obtain any assent to any change of the original one. They claimed to exercise a legal right, an option to carry "on deck," at certain deductions of freight and insurance, even against the objection of Mr. Geyer. According to Mr. Durand's own testimony Mr. Geyer did not assent, but objected; and the agents acted, not upon, or in consequence of, any assent on Geyer's part to carriage "on deck," but, upon their testimony, in spite of his objection thereto, and upon their claim of legal right. Even had I been satisfied that this conversation took place with Mr. Geyer instead of some other shipper, I must have been constrained to hold, therefore, that the carriage on deck, being against the shipper's objection and without authority from the libelant, was at the vessel's risk.

Decree for the libelant, with costs.