## THE ST. HUBERT. •

### (Circuit Court of Appeals, Third Circuit. March 6, 1901.)

### No. 20.

1. SHIPPING—DAMAGE TO CARGO—CONDITION OF BILL OF LADING REQUIRING NOTICE OF CLAIM.

   A provision of a bill of lading that "the shipowner is not to be liable * * * for any claim, notice of which is not given before the removal of the goods," imposes a reasonable and valid condition precedent to the right to maintain a suit for damage to the goods in shipment, either against the shipowner personally or in rem; and a failure to comply with such condition is not excused by the fact that the ship had knowledge of the damage, the purpose of the requirement being to advise the owners that they are charged with liability therefor.

2. SAME—CONSTRUCTION AND VALIDITY.

   A provision of a bill of lading that the shipowner is not to be liable for any claim, "notice of which is not given before the removal of the goods," properly construed, does not require such notice to be given before the goods are taken from the ship, but before their removal from the dock where they are deposited by the ship, and where, after they are released from the ship's tackle, they may be inspected and examined, both by the consignees and the officers of the ship. So construed, such provision is reasonable and valid.

3. SAME—TRANSSHIPMENT BY THROUGH CARRIER—LIABILITY OF SECOND CARRIER.

   The general course of business in forwarding when the ship of the signer of a through bill of lading does not go all the way to the port of ultimate destination, of which fact the shipper has knowledge, or is given notice by the through bill of lading, and the manifest necessity of transshipment by the through undertaker under such contract as it can reasonably make, justifies the presumption of its authority to make such contract, and to bind the shipper thereby, although the terms of the new contract may not be in all respects the same as its own; but, in any event. the undertaking and liability of the second carrier are measured by its own contract, provided its terms are reasonable, and not in contravention of the maritime law.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Francis S. Laws, for appellant.

G. Whitefield Betts, Jr., for appellee.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

GRAY, Circuit Judge. This is an appeal by libelant from a final decree in admiralty of the district court for the Eastern district of Pennsylvania, entered June 15, 1900, dismissing the libel, with costs. 102 Fed. 362. The libel was in rem, and was filed to recover the sum of $2,157.38, as alleged damages to 65 bales of goatskins, shipped at London, England, on or about September 10, 1897, and delivered at Philadelphia on or about October 8, 1897, by the steamship St. Hubert. These skins were originally shipped at Calcutta, and transshipped on the steamship St. Hubert, at London, for Philadelphia. It is alleged in the libel that the goatskins were insured by the libelant, and that they paid the consignees and owners the said sum of $2,157.38 as the amount of damage thereto, and for which they were lia-

ble as underwriters. It therefore brings its suit, claiming that the damage was caused by water, while the skins were being carried from London to Philadelphia, and was due to want of proper care of the skins, unseaworthiness of the said St. Hubert at the time of the shipment, lack of proper stowage and dunnage, and negligence and mismanagement of the vessel by master and crew. In July, 1897, Stanley & Co., of Calcutta, acting as agents for Cooper, Smith & Co., of Philadelphia, shipped to them 65 bales of goatskins, on board the steamships Palawan and City of Sparta; 40 bales going by the Palawan and 25 by the Sparta. The Palawan was a vessel of the Peninsular & Oriental Steam Navigation Company, and the Sparta was a vessel of the so-called "City Line"; neither of said ships carrying goods further than the port of London. The skins were shipped upon through bills of lading, by which the owners of the lines respectively contracted for their carriage and delivery "upon order  *   *   *  at the port of Philadelphia." At London the goods were transshipped by the agents of the two lines owning severally the Palawan and the Sparta on board the steamship St. Hubert, to be transported by it across the Atlantic to Philadelphia. For this transshipment from the original carriers to the steamship St. Hubert, bills of lading were given by the St. Hubert to the representatives of the original carriers. The bills of lading given by the owners of the Palawan and Sparta were through bills of lading from Calcutta to Philadelphia; that of the Palawan stating that the skins were to be carried via London, with a stipulation that "the company are to be at liberty to carry the said goods to the port of their destination by the above or other steamer or steamers, ship or ships, either belonging to the company or to other persons." The bill of lading for the skins shipped by the Sparta is also a through bill of lading from Calcutta to Philadelphia, but states that the ship is bound for London via Suez Canal, and that the goods are "to be transshipped or landed at London, with liberty to warehouse there, and from London to be forwarded by steamer, at the risk of the shipper, but at ship's expense, and to be delivered subject to the exceptions and conditions at foot hereof." It also has a general stipulation similar to that of the Palawan,—that the "owners are to be at liberty to carry the said goods to their port of destination by the above or other steamer or steamers, ship or ships, either belonging to the owners or other persons,  *   *   *  and to transship  *   *   *  the goods, either on shore or afloat, and reship and forward the same, at owner's expense, but at merchant's risk." Upon this bill of lading of the Sparta there is also the following note: "The goods to be carried to Philadelphia, subject to the terms and conditions of local bills of lading issued by the agents of such steamer or steamers." The bills of lading issued by the St. Hubert to the owners or agents of the owners of the Palawan and Sparta, the original carriers, were on the usual printed forms of an ocean bill of lading from London to Philadelphia, receipting for the goods as from the original carriers, and contracting to carry them as stated, "to be delivered against production of through bill of lading, properly indorsed, issued for these goods, per Palawan (or Sparta, as the case may be), or to his or their assigns." These bills of lading also contain the usual

stipulations and exceptions in favor of the ship and its owners, and, among others, the following: "The shipowner is not liable for any damage to any goods which is capable of being covered by insurance, nor for any claim, notice of which is not given before the removal of the goods." This transshipment of the skins in question at London from the ships Palawan and Sparta to the steamship St. Hubert, and the issuance by the owners of the St. Hubert of the said ocean bill of lading to the owners or agents of the other steamers, was in September, 1897. In due course thereafter the St. Hubert sailed, reaching Philadelphia about October 8th. Upon the arrival of the steamship at the dock in Philadelphia, the consignees, who were disclosed by the indorsement on the through bill of lading, according to which the St. Hubert had contracted by her bill of lading to deliver the goods, were duly notified, and the goods, two days thereafter, were landed by the steamship upon a covered dock. The consignees, upon the reception of the notice, handed the dock order to their broker, who proceeded to the dock, and examined the skins then landed thereon. They were reported by him to be wet, and, in consequence thereof, damaged, and the consignees reported that fact to the insurance company, the libelant and appellant herein. The skins were taken from the wharf to the storehouse of the broker, and by arrangement between the libelant insurance company and the consignees and owners the skins were sold, and the difference in import value and the proceeds of sale was paid to the owners by the libelant. As subrogated to the rights of the consignees, the libelant brought this action against the ship in the court below, alleging damage to have been occasioned as heretofore stated. The answer of the claimant, as owner of the St. Hubert, denies the charges of negligence in the libel, sets up as defenses a number of exceptions in the local or ocean bills of lading issued by the St. Hubert, including the defense that no notice of claim was given by the libelant or its assured, in accordance with the terms of the provision in that behalf contained in said bills of lading. This provision was, as heretofore quoted, in form a stipulation that the shipowner is not liable for "any claim, notice of which is not given before the removal of the goods."

In the view taken by the court below, as also by this court, the controversy over this stipulation, its proper construction, and its applicability to the case in hand, is determinative of the rights of the parties in this suit. No question was made by the libelant as to the fact that no notice of a claim for damages was given, either by the consignees or the libelant, to the ship, or the master thereof, or to any one representing it or the claimant. It was contended, however, that knowledge of the damp condition of the skins when landed upon the wharf, and before they were removed therefrom, was brought home to the master and ship's agents by reason of the following facts: First, that the draymen who took the skins from the wharf to the storehouse of the consignees' broker, on his receipt for the same, noted that four of the bales were wet; second, that, owing to the fact that one of the water-tight compartments in the hold of the ship had been flooded to extinguish a fire during the voyage, a general average bond was demanded from the consignees by the general average adjusters

on the supposition that the goods had been damaged by the water in or from said compartment, and were subject to general average, and to them was made the usual general average claim. This supposition was afterwards found incorrect, and the claim was not allowed. It is obvious, however, if the stipulation for notice here in question was binding upon the consignees and libelant, as a condition of a contract of affreightment on the St. Hubert, that no compliance with such condition can be inferred from either of the circumstances above alluded to. The notice stipulated for was one of claim against the ship or owner, not of the fact of damage, more or less, for which the owners and their representatives might well be justified in believing no claim would be 'made. There is no evidence that the adjusters represented the ship in any way, or had any authority to receive claims, and it is perfectly clear that no claim for damages was ever presented to them. Their office was an entirely different one, as has been explained. Stipulations for such "notices of claim" have frequently been considered by the courts, and their reasonableness asserted. The ship or its owner desires to know, not merely whether there is damage, for which no demand may ever be made, but whether there is any claim for damages made by the consignee, so that the necessary investigation can be made to ascertain the facts while they are fresh. The very dispute in this case—as to the cause of damage—shows the reasonableness of some stipulation of this kind. Angel v. Steamship Co. (D. C.) 55 Fed. 1005; Moore v. Harris, 1 App. Cas. 318.

In the present case the owners of the goods and their broker testified that they examined and opened the bales of skins on the wharf, and found them wet; but no claim was made, either by the owners or the libelant, to the ship, or to any one representing it, for several months thereafter. A member of the firm of Cooper, Smith & Co., owners of the goods, who examined the skins upon the dock, and afterwards in the broker's store, admitted that he never made any claim on the steamship or her agents, and said that he never thought he had any claim on them; that he had a claim on the insurance company, and looked to it. The record undoubtedly discloses the fact, and it must be taken, as found by the court below, that no notice was given to the ship, its owners or agents, that a claim for damages would be made against it or them, until some months had elapsed after the removal of the goods.

It is further contended by the libelant that the stipulation as to notice contained in the St. Hubert's bill of lading is not a defense to an action in rem, because the provision was only for the protection of the shipowners, and did not apply to the ship. We do not think there is either reason or authority for so narrow and harsh a construction of this stipulation as to notice. There may be cases in which it is necessary to discriminate between the liability of the shipowner and that of the ship, but this is not one of them. It is an exemption stipulated for in the bill of lading of the ship for injury to goods done on the ship, notice of claim for which is required to be given before removal from the custody of the ship. The shipowner can hardly be said to have secured himself against liability for want of notice of claim, if such exemption is not available when his property is seized and sub-

jected to payment of that very liability. As said by Judge McPherson in the case of The Westminster (D. C.) 102 Fed. 368, where a similar clause was under consideration:

"This, I think, cannot properly be construed so as to exempt the shipowner if he should be sued personally in a formal proceeding that may end in seizing his property by one kind of writ, and to deny him exemption if he should be sued in another form of proceeding that seizes his property in the beginning by a different kind of writ. * * * Ultimately his property is to be reached in order to satisfy the libelant's claim; and, if he is 'liable' when his property is exposed to the danger of a final writ of execution in a personal action, I can see no ground for holding that he is any the less liable when his property is seized in limine by a proceeding in rem. It is familiar law that exemptions are to be strictly construed against the carrier, but even in an exemption a strained construction should not prevail over the plain meaning of words."

We do not think anything can be added to the statement above made of what we think to be the law. The case of The Queen of the Pacific (D. C.) 61 Fed. 213, cited by the libelant, is not, in our opinion, when considered with reference to the peculiar facts of the case, in conflict with what is here held; but, even if it should be considered as authorizing a different construction of the clause in question, we must respectfully dissent therefrom.

This brings us to the underlying question, raised by the assignments of error, in this case, and decided by the court below in favor of the respondent,—whether the claimant's local bills of lading are the evidence of the contract for the carriage of the skins by the St. Hubert, and, as such, binding upon the parties to this suit as to the entire shipment. If they are not, the stipulation as to notice, which we have just been considering, would have no relevancy in the present case. Some objection has been made to the sufficiency of the proof of these local bills of lading. It is only necessary to say as to this that, in view of what the record discloses, and what was said by counsel on both sides at the argument before us, we must hold that these local bills of lading of the St. Hubert are properly before the court. If they are the evidence of the contract pursuant to which these skins were carried by the St. Hubert from London to Philadelphia, then the consignees and libelant are bound by the stipulation as to notice referred to. Though the goods were shipped at Calcutta, by agents acting for Cooper, Smith & Co., of Philadelphia, who were the owners of the goods, and by through bills of lading to Philadelphia, it must be taken as understood by the parties that the owners of the lines issuing said through bills contemplated a transshipment at London to some steamer or steamers other than their own, by which the carriage of these skins to Philadelphia was to be completed. Express evidence also is not wanting that the owners and shippers of the skins and the libelant were informed and knew that the goods were transshipped at London to the St. Hubert, and were being carried by her from that port to Philadelphia. The orders to the libelant for insurance made by the owners call for insurance on goatskins "per steamer City of Sparta (and steamer Palawan) from Calcutta to Philadelphia; transshipment via London and S/S St. Hubert, for account of whom it may concern," etc. From this testimony, the effect of which is not controverted, it would seem clear that the transshipment at London was

ratified or acquiesced in by the owners as a transaction authorized by their contract with the original carriers. Undoubtedly, the contract of Cooper, Smith & Co. was with these original carriers, and they (the carriers) were responsible to the consignees for the entire service contracted for, and the delivery of the goods in Philadelphia. In performing that service, however, it was necessary, and, as we have said, so understood by the parties to the contract, that a new and independent carrier from London to Philadelphia would have to be employed by the original carriers. The contract with such new carrier was a bilateral one, to which Cooper, Smith & Co. were not parties, though interested as consignees, to whom delivery was owing by the new carrier under the terms of its independent contract with the old carriers. Such new carrier was not in any way bound by the terms or stipulations of the through bills of lading, unless as they were expressly adopted by it as applicable to the particular service in which it was engaging. The new carrier receipted for the goods from the old, and delivered to them its bills of lading, which were the measure of its responsibility, and the terms of which were binding upon it, as an obligation of its own contract freely entered into. There is in these bills of lading a single reference to the through bills of lading issued by the owners of the Palawan and Sparta, in Calcutta, and that is the convenient and usual one in cases of transshipment that the delivery of the goods is to be made to the party or parties who appear to be consignees of the through bills of lading, properly indorsed. But this is an express term and stipulation of the particular bills of lading issued by the new carrier. The terms upon which the service was to be performed depended upon the consent of the new carrier as embodied in the agreement of its bills of lading. It assumed no duty or obligation towards the consignees, other than as stated and limited therein. The original carriers were obliged to make the best bargain they could for the continuance of the carriage service they had undertaken for the owners and consignees. If circumstances had been such as that, for instance, no vessel could have been engaged to carry the goods from London to Philadelphia for a freight rate that would not exceed the whole freight as stipulated for in the original contract upon the three bills of lading, it would have been the loss of such original carriers, and not of the consignees. In other words, the goods were carried from London to Philadelphia under and pursuant to a special and independent contract between the original carriers and the owners of the St. Hubert. By that contract a certain stipulation for the protection of the new carrier was made, which is not in itself unreasonable. Like the contract itself, this stipulation may be considered within the general powers conferred upon the original carriers by the shippers and owners, even without the express evidence alluded to of knowledge of and acquiescence in the transshipment to the St. Hubert. The general course of business in forwarding when the ship of the signer of the through bill of lading does not go all the way to the port of ultimate destination, and of which fact the through bill of lading gives notice, and the manifest necessity of the case that the through undertaker should transship under such contract as he can reasonably make, justifies the presumption of the req-

uisite authority, in the absence of any notice of want thereof brought to the knowledge of the new carrier.

Another view of the situation of the parties from its legal standpoint is that one who contracts, on a through bill of lading, to carry goods from one port to another, is responsible to the owner or consignee for the entire service between the two ports, whether in his own ships or in those procured by him to enable or assist him to perform his contract. Such assistance from other and independent carriers may be necessary to the fulfillment of his undertaking under his through bill of lading. It is not required that he, or the independent auxiliary carrier, should invoke the authority of agency, express or implied, from the shipper or owners, to sanction such procurement; as it can be referred to the free choice of means open to the signers of the through bill of lading, with which the shipper or consignee has no right to interfere. The latter may hold the through carrier to a strict fulfillment of his contract with them, but neither of them is on that account a party to such auxiliary contracts. In the exercise of this freedom of contract the engagement between the original and new carrier is, of course, subject to those duties and requirements which are imposed and exacted by the maritime law, but in all other respects the independent contract of the two carriers must be taken to govern the transportation service thereby undertaken. Its reasonable conditions and exemptions are as much a part thereof, and are as binding, as the main stipulation of carriage and affreightment. If the terms are more favorable to such new carrier than those contained in the through bill of lading, the owner, if he suffer thereby, must look for redress under that original contract. In the language of the court below:

"To say that the first bill of lading binds the second carrier is to require him to submit to a contract concerning which he was not consulted, and to which he did not agree."

What we have said applies to the whole shipment from both the Sparta and the Palawan on the St. Hubert; but the note on the margin of the through bill of lading of the Sparta, above recited, would seem to remove all ground for controversy as to the 25 bales of skins received from that ship. We are of opinion, therefore, that the stipulation as to notice contained in the St. Hubert's bill of lading was, if reasonable in its character, binding upon the consignees and the libelant, which was subrogated to their rights. The liability of the last carrier to the owners of the goods it had undertaken to carry, whether that liability rested on contract or in tort, must be taken to be limited by the express stipulation contained in its individual contract of service. The learned judge of the court below has found that the requirement of notice before removal of the goods would be unreasonable in so far as it was construed to mean before removal of goods from the ship, but that, in as much as notice of claim was required by the contract under which the goods were carried, a notice within a reasonable time after the removal of the goods from the ship or their delivery to the consignee should still be exacted. Undoubtedly, notice of claim of damage, without regard to the precise time when made, is of the essence of the stipulation, and, if it divisible from the stipulation

that it should be made before removal from the ship, if that be the true construction thereof, and as in fact no notice of such claim was given until between three and four months after the delivery of the goods, and after three or more intervening voyages of the ship had been made, the court was right in deciding that such a notice was not within the reasonable time that the law would require. We do not think, however, that such a construction of the stipulation in question is demanded by the language in which it is expressed. The words are that the shipowner is not liable for any claim, "notice of which is not given before the removal of the goods." The "removal of the goods" here mentioned does not, we think, necessarily mean, or, under a reasonable construction of the clause, properly mean, the removal from the ship, but removal from the place of deposit of the goods upon the dock or wharf when freed from the ship's tackle. Removal thence would be removal out of the view of, and possibility of inspection by, the officers of the ship, and might reasonably qualify the ship's liability, if so stipulated; whereas to require notice before removal from the ship itself would be to impose upon the consignee a condition almost, if not quite, impossible of performance. Where two constructions of a contract are equally consonant with its language, the one reasonable and the other unreasonable, the law will adopt that construction which is reasonable and works no injustice to either party.

The expression of these views renders unnecessary the consideration by this court of the questions of fact raised by the libelant as to whether the skins were wet or not, and, if wet, whether they became so by natural process of sweating, or by some want or unseaworthiness in the vessel, or negligence of those in charge of her; and it only remains to say that the decree of the court below is affirmed.