## THE IDEFJORD.

District Court, S. D. New York.
Dec. 22, 1939.

Bigham, Englar, Jones & Houston, of New York City (James N. Senecal and Daniel A. Sullivan, both of New York City, of counsel), for libellant.

Haight, Griffin, Deming & Gardner, of New York City (Wharton Poor and James McKown, Jr., both of New York City, of counsel), for claimant-respondent.

JOHN W. CLANCY, District Judge.

In December, 1936, and January, 1937, libellant by cable exchanges, purchased five lots of wool totaling 321 bales, from one, Zariffa, a wool exporter in Cairo, Egypt. They had been doing business with each other since 1928 in what became an established course of dealing. Offers were made by the seller and accepted by the purchaser through cable advices and the terms were C & F on ninety day letters of credit, drafts to be presented for acceptance at London banks. We need not distinguish the several purchases and shall consider them as one lot. Libellant, upon contracting his purchases, immediately obtained ninety day sight letters of credit from New York banks in favor of Zariffa. This credit was cabled to correspondent banks in London where funds awaited presentation of Zariffa's drafts, full sets of bills of lading, and the other necessary documents.

Zariffa delivered the bales to D. C. Pitellos & Co. at Alexandria, which issued practically like bills of lading for the different lots on and between January 26th, 1937, and February 19th, 1937. Consignees named therein were the New York banks or their assigns. The terms included, among other things, transhipment at Port Said, on divers named steamships "and/or steamers." Only one of the bills named the Idefjord, but we consider this unimportant as the bills of lading read:

"6. Through cargo for ports East or West of Port Said will be transhipped to final destination by first available opportunity. Any statement hereon as to a specific steamer taking such cargo is only an indication that efforts will be made to effect "shipment by such steamer, but it is clearly agreed and understood that, as ships' sailings at Port Said are not on definite fixed dates, no responsibility of any sort can be attached to Messrs. D. C. Pitellos, in the event of such steamer being missed, and transhipment effected by some other steamer, or for whatever delay occurring in the forwarding of such cargo.

"7. Transhipment and Forwarding. The carrier shall have liberty as regards the whole or any part of the goods at any time during the transit, and as often as may be deemed expedient to tranship to any other ship or land or store * * *."

The bill of lading further provides: "Subject to all the terms and conditions contained in the bills of lading at present in use by: Messrs. The oncarrying line of steamers."

The merchandise went forward to Stapledon and Sons at Port Said, which is a port of uncertain call and where developed some reason for concern at the prospect of a failure of ships to carry the goods below deck in the then near future. Negotiations were opened with the Port Said and Suez Coal Company, the agents of Phelps Bros. and Co., time charterers of the Idefjord, to arrange shipping on that boat which was 365 feet long and with 49 feet 6 inch beam and was owned by the claimant. On February 22, Port Said and Suez Coal Company wrote Stapledon that

it could only arrange for deck stowage at shippers' risk to which Stapledon, under date of February 23, 1937, answered: "Shippers have agreed for deck stowage as far as Casablanca only. At Casablanca the wool and skins must be stowed below deck. We are clausing the manifest accordingly." On February 23, 1937, Pitellos wrote Zariffa: "With reference to the above lots please note that the same will be transhipped on the 26th inst. per SS Idefjord. These will be shipped on deck at shippers risk as far as Casablanca only and we mention this for you to do the additional insurance." On the 26th of February, 1937, Port Said and Suez Coal Company delivered a letter to the captain of the Idefjord which read:

"Kindly note that on the authority of Messrs. Phelps Bros. & Co. Inc., New York, we are shipping a number of bales Wool and Sheepskins destined for the U. S.A. on deck at Shippers' risk till Casablanca only where this cargo should be restowed in holds.

"You will no doubt take all possible precautions with this deck cargo to ensure its safe arrival at Casablanca, and the goods should be tarpaulined and well lashed down.

"After restowage has been effected at Casablanca kindly write us to this effect, and at the same time please let us have your report on the weather conditions experienced on the voyage also condition of all deck cargo on arrival at Casablanca.

"Should you meet with bad weather and lose some of your deck cargo kindly Note a Protest at Casablanca with extension at New York if necessary to cover the ship fully.

"Awaiting your confirmation of the foregoing from Casablanca, and asking you to kindly sign the duplicate of this letter as a provisional acknowledgment."

The manifest, delivered to the captain, read: "On deck at shippers' risk till Casablanca only where goods must be placed in hold." The mate's receipts bore the same phrase. No reduction in freight charge was made because of "on deck" carriage.

On February 27, 1937, the goods were delivered on board the ship which was carrying general cargo and the Port Said and Suez Coal Company prepared non-negotiable bills of lading which read: "Cargo shipped on deck at shippers' risk till Casablanca only where goods must be restowed in hold." The originals of these bills were kept by the Port Said and Suez Coal Company in whose possession they remained continuously until after this action was brought. What became of the copies or whether there were any does not appear. The bales were loaded from open lighters onto the Idefjord. They were placed in tiers on the after well deck, between the after end of the bridge deck and the poop, over dunnaged hatch covers and casks of orange peel which raised the bottom of the lowest bales a distance of 3 feet to 3 feet 7 inches above the deck and they were covered with a single layer of tarpaulins, some new and some used, which overlapped and were sewed together at various places. Planks and boards were run fore and aft over the tarpaulins and wires from the railings and stanchions were run thwartships over these. There is some evidence to support libellant's claim that the ship was loaded below not only the winter water line of 23 feet 7½ inches draft and 5 feet 7 inches freeboard but also below the summer water line of 24 feet 1 inch draft and 5 feet 1½ inch freeboard. For reasons hereafter stated, we deem it unnecessary to elaborate upon the facts tending to support or disprove this contention.

Just before the ship left Port Said, or as it was leaving, the captain's copies of the original bills of lading were delivered on board. The ship proceeded through the Mediterranean where, commencing March 2, she encountered excessive rains, heavy seas and westerly gales. United States Hydrographic Reports assert such weather is not unexpected there at that season and the Port Said and Suez Coal Company's letter of February 26, 1937, may point the same way. We see no need why we should find such weather normal as a fact. Weather is unreliable to some extent everywhere.

On March 12, 1937, upon arrival at Casablanca, it was discovered that the deck cargo had become wet from the rain and spray and some of it was heating, so it was left there.

The London banks accepted all but one of the original bills of lading and other papers during the month of February, 1937, and the last on March 2, 1937. These, in turn, were forwarded to the New York banks and received there during February and up until March 10, 1937. Acceptance

by the London banks made their obligation to pay absolute. All papers arrived and were paid for by libellant in due course. Under date of February 27, 1937, Zariffa wrote libellant: "Insurance—I confirm my cables of 20th inst. and am today giving you the necessary to enable you to insure the shipments in question, with transhipment at Port Said. For your guidance my forwarders advise me that yesterday the lots below have been transhipped to SS Idefjord at Port Said. * * * Furthermore, kindly arrange your insurance accordingly inasmuch as the above have been loaded 'on deck' only up to Casablanca, because in this port the steamer will unload one thousand tons of merchandise. In view of the lack of space on steamers I found it preferable to ship in this way, particularly as the 'deck' will only be for part of the Mediterranean, which is a calm sea particularly at this period." Libellant did not recall receiving, nor could he find, the cable message referred to but received this letter on March 17, 1937. A later letter written by Zariffa denies that he ever authorized such shipment.

■ From the facts it appears clear and we find that Stapledon and Sons, in the ordinary course of their business, were entrusted with the wool for the purpose of transhipping it and that this firm, representing that it had the consent of the shipper, agreed and contracted with the carrier for "on deck" stowage at shippers' risk.

■ We find that the wool was damaged while on the Idefjord's deck because it was wet by sea water and rain. The Idefjord carried her cargo through to Casablanca and below deck cargo was uninjured. The wool was raised at least three feet above deck. We cannot perceive any causal connection between the alleged overloading, assuming it to be the fact, and the wetting of the cargo and disregard any claim for liability based thereon. The Francis Wright, 105 U.S. 381, 26 L.Ed. 1100; The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901; May v. Hamburg etc. Gesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; Carver on Carriage of Goods by Sea, Seventh Edition, § 17.

■■ Deck stowage as any other must be proper. The deck stowage of libellant's wool, from all that appears in the evidence, was proper and was effected with such due regard for the protection of the wool as was reasonably required for "on deck"

stowage of such a cargo. The wool was completely covered with good tarpaulins and so secured by dunnage and wire ropes that it stood the voyage without shifting. True, both rain and salt water seeped through the covering to come in contact with the wool but the vessel was not an insurer and negligence cannot be concluded from the mere fact that severe tempests and seas wet the cargo. The Idefjord's second officer said that the wool was covered as were cargoes of wood pulp and that it was good stowage. The captain also stated the stowage was good and there was no convincing evidence to contradict this. We, therefore, absolve the carrier from any liability because of improper "on deck" stowage. Resolution of the facts shows that the proximate cause of the damage was "on deck" stowage. Having eliminated the other alleged sources of liability, we must determine whether any liability for that stowage justly may be imposed on the ship. Was the stipulation which clearly purported to authorize "on deck" carriage and to exempt the carrier from liability for damage arising therefrom a defense against the claim of this libellant who parted with value in reliance upon the original clean bill of lading?

■ We approach the determination of the issues involved in this case mindful of the language of our Judge Woolsey in The Carso, D.C., 43 F.2d 736, 744: "A bill of lading is a document of dignity, and courts should do everything in their power to preserve its integrity in international trade for there, especially, confidence is of the essence." Nevertheless, from its very nature a bill of lading has to do with merchandise; not money—and, merchandise in transit—so that everyone dealing with the bill is charged with the knowledge that the merchandise described in it is in transit and, therefore, being handled and treated by many persons whom he may not even know and who may not know him; and, the principles of contract law persist though a bill of lading be out and they must be sustained in proper case.

■ Here the initial carrier undertook, as is evidenced by the through bill of lading, to deliver the merchandise to its ultimate destination, all parties concerned contemplating that there would be transhipment. We then find Stapledon and Sons in possession of the goods at the point of transhipment with a duty to tranship. The captain of the Idefjord and

the Port Said and Suez Coal Company informed them of the fact that there was no room below deck on the Idefjord. Stapledon and Sons, the captain of the Idefjord and the Port Said and Suez Coal Company then contracted, as appears clearly from all the papers evidencing the transaction, that the goods would be carried by the Idefjord "on deck at shippers' risk." We think, on these facts, the only fair measure of the second carrier's liability is its own contract with Stapledon and Sons. Stapledon and Sons and Port Said and Suez Coal Company, throughout the negotiations, and the captain maybe some time before and certainly when anchor was weighed at Port Said, knew of the existence of the original through bills of lading and were on notice of their terms but if any theory of estoppel is intended by the libellant to hinder their defense here, the answer is plain; they had nothing whatever to do with the original bill and had no relationship with consignor or initial carrier. We think on these facts that the only fair measure of the second carrier's liability is its own contract with Stapledon and Sons.

■■ But libellant argues that the carrier, knowing of the original bill of lading, violated the rights of the consignee by accepting the goods for a manner of carriage different from that implicit in the initial bill of lading. It is established law that failure to mention place of stowage, in the absence of custom to the contrary, implies that the goods will be stowed below deck. The Delaware, 14 Wall. 579, 20 L.Ed. 779; St. Johns Corp. v. Companhia Geral, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201; Two Hundred and Sixty Hogsheads of Molasses, 24 Fed.Cas. No. 14296; The Sarnia, 2 Cir., 278 F. 459. The evidence has been wholly inadequate to establish a custom or usage prevailing at Port Said which warrants "on deck" stowage of wool for shipment through the Mediterranean. But a carrier has a right to make any reasonable contract with the person in possession of the goods. The St. Hubert, 3 Cir., 107 F. 727; Hall Corporation v. Cargo ex Steamer Mont Louis, 2 Cir., 62 F.2d 603; York Manufacturing Co. v. Illinois Central Railroad Co., 3 Wall. 107, 18 L.Ed. 170; Hus v. Kempf, 12 Fed.Cas. No. 6943; Waldron v. Fargo, 170 N.Y. 130, 62 N.E. 1077; Nelson v. Hudson River Railroad Co., 48 N.Y. 498; Squire v. New York Central Railroad Co., 98 Mass. 239, 93

Am.Dec. 162; Alexander v. Malcolmson, (1868) Ir.R. 2 C.L. 621; Ir.R. 3 C.L. 578. Such contracts have been held binding on the consignee even though their terms differed from those in an original bill of lading. The Hibernian, [1907] Prob. 277; The St. Hubert, supra; The Cayo Mambi, 2 Cir., 62 F.2d 791; Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712, 60 L.Ed. 1156.

■ Was this a reasonable stipulation in view of the knowledge on the carrier of the outstanding through bill? "Deck stowage at shippers' risk" is an exemption clause long employed in maritime contracts and it has been held that such stowage with the consent of the shipper is not unreasonable and effectively limits the responsibility of the carrier. The Carriso, 9 Cir., 30 F.2d 279. And this is true even though "on deck" stowage of any goods exposes them to added risk of jettison in tempestuous weather. Lawrence v. Minturn, 17 How. 100, 15 L.Ed. 58; The Paragon, 18 Fed.Cas. No. 10708. In the abstract, such a clause is not necessarily unreasonable.

It may be argued that the reasonableness requires further examination into the specific facts of each case. In The Thomas P. Thorn, 23 Fed.Cas. No. 13927, Judge Benedict did not consider "on deck" stowage unreasonable in an action by a consignee which involved deck stowage with shipper's consent of tobacco which is clearly subject to damage from the elements. In The Carriso, supra, a case involving the deck stowage of a cargo of cork, the court holding that the nature of the cargo does not effect the reasonableness of the stipulation, in answer to the contention that if goods from their nature cannot be safely carried on deck, a stipulation for such carriage is invalid, stated [30 F.2d 280]: "But, if the goods can be 'safely' carried on deck, the shipper's consent would be wholly needless. And if the shipper may, notwithstanding the Harter Act [46 U.S.C.A. § 190 et seq.], lawfully stipulate that his lumber may be carried on deck, for what reason is he to be prohibited from making a similar stipulation respecting his cork board? Some kinds of lumber may suffer less injury than cork board from salt water and exposure to the weather, but other species, it is imaginable, may suffer more. Where is the line to be drawn, and how are the courts to draw it? It is not a question of compelling a shipper to assume a peril in order to obtain

the carriage of his goods. Two modes are offered him, the one safer than the other, and presumably more expensive. He may have either at his option. Nor is it a question of relieving the carrier from the consequences of its negligence; it must exercise all reasonable care in either case."

 To that court's query: "Where is the line to be drawn, and how are the courts to draw it?" we might add: And how is the captain to draw it? Goods are in possession of a shipper or initial carrier who has a duty to arrange for their shipment. A ship comes into port and the captain is asked to carry them. We will not hold that the captain must decide the reasonableness of the proposed carriage for it may well be impossible that he would know or be able to determine in his short visit all the circumstances which would compose the situation of the goods. See Alexander v. Malcolmson, 2 Ir.R. 621, 635. We are aware that a carrier has certain general responsibilities and among these is an obligation not to wilfully destroy the merchandise with which it is entrusted. We, therefore, do not decide that a carriage which would inevitably result in destruction might validly be contracted for under such circumstances but we do believe that if a certain mode of carriage is not obviously unreasonable, then, any contract for such carriage is neither invalid per se nor invalid under the circumstances, in the absence of clear proof of knowledge of some fact that would establish it as unreasonable. We have considered cases wherein the carrier has been held responsible for failing to meet the obvious requirements of the cargo; e. g., Nichiyo Maru, 4 Cir., 89 F.2d 539; Bank Line v. Porter, 4 Cir., 25 F.2d 843; Doherr v. Houston, D.C., 123 F. 334, and others, but do not think that they have any application here as they involve negligence in the handling of the cargo in violation of the contract rights of the parties, whereas here, we are determining the validity of a contract. In the one instance, we have rights and obligations arising out of the contract which have been breached and, in the other, we are asked to sustain a claim alleged to have arisen not out of the contract, but in spite of it. Here we have wool in Port Said and destined for America. The carrier advises that he has no room to carry the cargo and is told that the shipper has consented to "on deck" stowage. It was apparent that the exposure of "on deck" stowage might cause harm to this cargo. It was, though, quite possible that the wool might arrive at Casablanca undamaged. The outcome was uncertain but may we say for that reason that acceptance of this cargo by the carrier for "on deck" carriage was unreasonable and that it could not rely upon the decision and authority of Stapledon and Sons? Innumerable factors enter into the reasonableness of such manner of carriage, most of which the captain could not know and should not be required to know. There was an obligation of the shipper to avoid unnecessary delay. There was a fluctuating market. There was the cost and danger of further storage at Port Said. There was the uncertainty of obtaining another ship to carry the wool. Any one of these or other easily imagined considerations might well have made "on deck" stowage reasonable and advantageous with all its risk. We think, therefore, that the carrier, recognizing the risk, had a right to contract with the person in possession of the goods, irrespective of their nature, relying upon that person's determination of the reasonableness, under the circumstances, of such a contract and that person's authority to make any contract which could be reasonable and was not conclusively known to be otherwise. This latter is true, especially where, as here, the person in possession affirmatively represents that he has such authority and the carrier has no positive knowledge to the contrary. The Caledonier, 2 Cir., 31 F.2d 257. The contract so made determines the rights and duties of the carrier.

The libel is dismissed.