THE IDEFJORD.

BLUMENTHAL IMPORT CORPORATION
v. DEN NORSKE AMERIKALINJE
A/S.

No. 397.

Circuit Court of Appeals, Second Circuit.

Aug. 9, 1940.

Writ of Certiorari Denied Nov. 25, 1940.

See 61 S.Ct. 175, 85 L.Ed. ——.

Martin Detels, of New York City (Bigham, Englar, Jones & Houston and James N. Senecal, all of New York City, on the brief), for libelant-appellant.

Wharton Poor, of New York City (Haight, Griffin, Deming & Gardner and James McKown, Jr., all of New York City, on the brief), for claimant-appellee.

Before SWAN, CLARK, and PATTERSON, Circuit Judges.

CLARK, Circuit Judge.

This appeal raises the question of liability of a forwarding steamship carrier, under a through bill of lading, for damage by reason of rain and spray to a cargo of wool, owned by libelant and stowed on deck of the steamer. The district court exonerated the carrier on the ground that such on-deck stowage had been agreed to by representatives of the shipper and owner of the goods and was proper under the circumstances. Libelant denies that it as owner ever consented, and rests its basic claim of error in the decision on the ground that a "clean" bill of lading negotiated to innocent purchasers does not permit of such a change from the terms of the original contract of carriage.

In December, 1936, and January, 1937, libelant, a New York importing concern, had purchased 321 bales of wool from one Zariffa, in Cairo, Egypt, by cable exchanges. Terms were C. & F., and libelant, immediately on contracting for the purchase, opened a letter of credit in favor of Zariffa at London banks through Ameri-

can banking corporations. The banks were instructed to honor Zariffa's drafts with bills of lading attached.

At Alexandria, Egypt, Zariffa, between January 26 and February 19, 1937, delivered the wool to D. C. Pitellos & Co. in five lots for shipment, notifying libelant by telegraph as each delivery was made. Pitellos & Co. issued five similar negotiable bills of lading stating that varying numbers of bales of wool had been shipped in apparent good order at Alexandria for delivery in New York and Philadelphia to libelant's bankers or their assigns as consignees. Each bill provided for transshipment of the goods at Port Said by a named vessel "or other suitable steamer." On the face of the bills, after designation of the number of bales of wool and their weight, and the directions for their transshipment at Port Said, there appeared printed in small capitals the words "Subject to All the Terms and Conditions Contained in the Bills of Lading at Present in Use By: Messrs. ———." The blank following the word "Messrs." was on four of the bills completed with the typewritten words "The oncarrying line of steamers"; in the fifth case a specific name had been typed in, only to be crossed out and the same phrase as in the other bills added by pen and ink. The bills also contained some twenty-seven numbered and three unnumbered conditions and reservations printed in small type, among which were separate provisions exonerating Pitellos & Co. and the carrier from all liability for delay in forwarding, and other provisions that goods forwarded were subject to the conditions and exceptions of the forwarding or carrying conveyance. The bills did not, however, contain permission for on-deck carriage.

The goods were freighted below decks from Alexandria to Port Said. At Port Said, in some manner not disclosed by the record, the wool came under the control of Wm. Stapledon & Son, whose letterhead shows them to be agents for several steamship lines, but not including any concern participating in the transaction now before us. Stapledon & Son experienced considerable difficulty in finding a suitable ship for on-carriage to the United States. At length, toward the end of February, Stapledon & Son arranged with the Port Said & Suez Coal Co., agents for the charterers of the Idefjord, to carry the wool on the Idefjord, above deck, at shipper's risk across the Mediterranean, with restowage in the hold at Casablanca. Libelant asserts a complete lack of proof as to whether or not Stapledon & Son were authorized by the shipper, Zariffa, to contract for on-deck carriage; but in the view we take of the case, Zariffa could not give such authority, had he tried to do so, unless he noted that fact on the original bills of lading before presenting them.

The wool was placed on the Idefjord's deck, and nonnegotiable bills of lading were prepared on February 27, 1937, by the Port Said & Suez Coal Co., stating the terms of carriage and expressly providing for stowage "on deck at shippers' risk till Casablanca only where goods must be restowed in hold." It does not appear that these bills were ever issued to the shipper, though the previous correspondence and the master's receipts were to a similar effect. Before the Idefjord sailed, its captain was presented with, and he accepted, the "captain's copy" of each of the five original Alexandria bills of lading. By that time four of these original bills, together with sight drafts and other documents of sale and transfer, had been presented by Zariffa to the London banks, and Zariffa's drafts had been honored. And, pursuant to the instructions given earlier, the last bill was so honored on March 2, 1937.

When the wool was damaged en route, libelant filed this libel against the Idefjord. The district court held that Stapledon & Son had possessed apparent authority to bind all parties interested in the wool to a contract for stowage on deck at shipper's risk. It also ruled that the damage to the wool had been caused solely as a result of its shipment on deck, and that the Idefjord had not been negligent in its stowage or in departing from Port Said loaded slightly above its summer marks. The Idefjord, D. C. S. D. N. Y., 31 F.Supp. 667.

We see no reason to disturb the finding that the damage was due solely to the on-deck carriage, and accept the lower court's conclusion that the Idefjord and its crew were otherwise free from negligence. The only substantial issue remaining in the case, as we view it, concerns the privilege of the Idefjord to agree with Stapledon & Son for on-deck carriage, in view of the outstanding Alexandria bills of lading.

■ 1. The Idefjord contends that its liability must be measured by its own con-

tract of carriage, as expressed in the non-negotiable bills of lading which it prepared at Port Said, with the statement "on deck at shippers' risk" typed thereon. It is argued that the Idefjord could not have been bound by any of the terms or conditions of the original Alexandria through bills, even though the Idefjord's captain was presented with his copies thereof. We are not disposed to accept this measure of the on-carrying steamer's responsibility.

The Alexandria through bills of lading were negotiable, and upon their presentation with drafts to the London banks the seller received his money. This was by no means an unusual or an unreasonable course of business.[1] The Idefjord, having notice of the existence and terms of these bills, knew, therefore, that commercial drafts were being or might be honored in reliance on the normal conditions of carriage set forth therein. Under these circumstances we do not believe it was free to arrange carriage of the cargo in substantial disregard of the original agreement. The T. A. Goddard, D. C. S. D. N. Y., 12 F. 174, 182; The Cayo Mambi, 2 Cir., 62 F.2d 791, 792. The authority of Stapledon & Son to vary that agreement was not known to the Idefjord; even if Stapledon & Son had obtained the requisite permission from the seller, the Idefjord was on notice, from the terms of the bills, that the seller or order was not the consignee of the goods and therefore might not and probably did not possess valid authority to bind whosoever might be the holder of the negotiable through bills of lading. Unless a duty on the part of the on-carrying steamer to comply with the through bill be recognized, no protection can be afforded to the banks and merchants who are accustomed to rely upon such arrangements for financing imports. Nor does the imposition of this obligation confront the Idefjord with Hobson's choice; it was free to reject the cargo if it was unable to carry it as required by the through bills of lading.

Cases which have been cited to us as containing language supporting the opposite view, such as Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712, 60 L.Ed. 1156; The Cayo Mambi, supra; Miller v. Harvey, 221 N.Y. 54, 57, 116 N.E. 781, L.R.A.1917F, 559; and Briggs v. Boston & L. R. Co., 6 Allen, Mass., 246, 83 Am.Dec. 626—to which may be added Aberdeen Grit Co. v. Ellerman's Wilson Line, (Court of Session) [1933] Sess.Cas. 9—are not opposed in fact. Many of these did not involve variation of the terms of negotiable through bills of lading, and in none of them does it appear that the on-carrying conveyance had notice of the terms of the original through agreement. We read The Cayo Mambi, supra, for example, as sustaining our position. Certain language in The St. Hubert, 3 Cir., 107 F. 727, 732, and in Crossan v. New York & N. E. R. Co., 149 Mass. 196, 198, 21 N.E. 367, 3 L.R.A. 766, 14 Am.St.Rep. 408, taken from its context does lend more support to claimant's position. Limited to their facts, however, both these holdings are not pertinent to the present aspect of the case. In The St. Hubert, supra, it did not clearly appear whether or not the through bills were negotiable; in any event, certain clauses of the through bills were construed as authorizing the variations later made—a circumstance we refer to at length below. In the Crossan case, again no problem of negotiability was involved, and the on-carrier ran the risk of a lawsuit by the plaintiff if it were to refuse, as a common carrier, to carry the shipment.[2] The Idefjord was in no such danger. It was already loaded above even its summer marks, and no rule of law compelled it to accept further on-deck cargo, even when tendered by the owners thereof. Indeed, the alternative of delay in the forwarding was provided for in the original bills.

2. The Idefjord next contends that the variation it inserted in the contract of carriage was expressly authorized by the terms of the original Alexandria bills. It was within the contemplation of all parties that the cargo would be transshipped at Port Said, and on-carried to New York by another steamship line. The provision

---

[1] Here the buyer's bank or order, rather than the seller or order, was the named consignee. The only effect of this variation, so far as concerns us here, was to take the seller out of the picture at once, as the carriers would then see at a glance.

[2] Moreover, the decision of the second carrier in the Crossan case was eminently reasonable under the circumstances. The only variation was in the amount of the freight to be charged; and had the shipment of horses been refused, the cost of their upkeep would probably have exceeded the amount of the disputed freight charge. The reasonableness of the variation imposed by the Idefjord—on-deck carriage—is discussed below.

that the forwarding shipment should be subject to the conditions of the bills of lading *at present in use* by the on-carrying steamers, or some equivalent expression, such as the "regular" bills of lading of the on-carrier, seems not infrequent. It had the effect of incorporating into the original bills of lading whatever terms were to be found in the regular printed form of bill of lading used by the Idefjord, so long as those terms were not inconsistent with the original bills. Bank of California v. International Mercantile Marine Co., 2 Cir., 64 F.2d 97; The Cayo Mambi, supra; The Hibernian, [1907] P. 277 (especially the opinion of Fletcher Moulton, L. J., at 282). Cf. Scrutton on Charterparties and Bills of Lading, 14th Ed. 1939, 84. But this clause would be of no help to the Idefjord, since the provision for on-deck carriage was not part of the Idefjord's printed form bill of lading, but was typed over the printed form for this particular contract of affreightment. It was in no sense a term of the bill of lading "at present in use by Messrs. —— The oncarrying line of steamers." Even if it were, it could hardly be said to be consistent with the original bills.

■■■ Each of the original bills also contained as a part of Clause 7 the provision that "Goods transhipped, overcarried or destined for ports where the ship does not call will be forwarded at ship's expense *but subject to the conditions and exceptions of the forwarding conveyance,*" which was substantially repeated at the end of the bill, as follows: "This Bill of Lading shall be construed and governed by English Law, and shall apply from the time the goods are received for shipment until delivery, *but always subject to the conditions and exceptions of the carrying conveyance.*" (Italics added.) This provision must be construed in the light of the earlier provision referring to the regular bills or the bills "at present in use" by the on-carrier. The earlier provision, being filled out for the occasion by typing or handwriting, would be preferred if there were any inconsistency between them. Pacific Rice Mills v. Westfeldt Bros., 5 Cir., 31 F.2d 979; Deutschle v. Wilson, 8 Cir., 39 F.2d 406; Thomas v. Taggart, 209 U.S. 385, 389, 28 S.Ct. 519, 52 L.Ed. 845, affirming In re Jacob Berry & Co., 2 Cir., 149 F. 176. In any event, this added provision did not mean that the second carrier might propose, and the initial carrier might agree to, any sort of harsh, arbitrary conditions of carriage. We may assume it did mean that on-carriage need not accord strictly with the terms of the original bills. Aberdeen Grit Co. v. Ellerman's Wilson Line, supra. But the most this clause can mean is that by the express provisions of the Alexandria documents, the initial carrier or its representative and the Idefjord might arrange reasonable terms for carriage of the goods, in line with the latter's ordinary forms of contract and not fundamentally inconsistent with the original bills.

■■■ The case therefore turns on whether or not a contract for on-deck carriage at shippers' risk was such a reasonable one under the circumstances. We do not think it was. The very essence of the C. & F. contract was payment on presentation of a clean bill of lading. As stated above, the Idefjord was chargeable not only with notice of the existence of outstanding clean negotiable bills, but also with knowledge that such bills might be transferred to innocent parties in the regular course of trade. It is settled beyond dispute that a clean bill of lading negatives on-deck carriage of goods such as wool. The Delaware, 14 Wall. 579, 604, 20 L.Ed. 779; St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral Commercial, 263 U.S. 119, 124, 44 S.Ct. 30, 68 L.Ed. 201, affirming The St. Johns N. F., 2 Cir., 280 F. 553; The Gran Canaria, D. C. S. D. N. Y., 16 F. 868, 872. It has even been held that a captain cannot issue a clean bill if the goods are stowed above deck. The Kirkhill, 4 Cir., 99 F. 575, 578. Had the on-deck provision been noted on the original bills, they might in all probability never have been honored by the London banks. By carrying the goods above deck, knowing that fact was not marked on the original bills, the Idefjord allowed a fraud to be worked upon any one who might innocently pay value for the bills. The Kirkhill, supra. The contract for on-deck stowage, therefore, cannot be deemed consistent with the original bills, or reasonably within the contemplation of the parties. It may have been true that the alternative of allowing the goods to remain in Port Said until below-deck stowage became available was fraught with danger to the value of the cargo; but such a course was authorized by the provisions in the original bills waiving liability for delay in transshipment. On-deck carriage was not.

■■■ The view we have taken does not conflict with The St. Hubert, supra, Reid v. Fargo, supra, or cases like Crossan v. New York & N. E. R. Co., supra, and

Aberdeen Grit Co. v. Ellerman's Wilson Line, supra. The reasonableness of the variation depends on the circumstances of the particular case, and upon whether or not a clean negotiable document of title is outstanding. The variations in the decisions above cited were either of the sort ordinarily to be expected in different bills of lading or eminently reasonable under the situation confronting the on-carrying conveyance. In none of those cases was the variation one which could work harm upon an innocent third party.

3. We find necessary only brief comment on the other contentions advanced. The supposed proof that the buyer ratified the arrangement for on-deck stowage is not convincing. Knowledge was not brought home to the libelant before the ship sailed; only the shipper knew, and he appears to have done nothing except to write libelant a letter delivered in America long after the damage was done. But after all, he had stepped out of the picture and was perhaps well advised in so doing. That libelant affected insurance when it received the shipper's letter on March 17, 1937, and did not seek to disaffirm its purchase, can have no bearing here; the bills had already been presented, and libelant's responsibility to the holders fixed. Cf. Hansson v. Hamel & Horley, [1922] 2 A. C. 36, 46; Harper v. Hochstim, 2 Cir., 278 F. 102, 103, 20 A.L.R. 1232. And though it is claimed that the ship's liability in a suit in rem is measured by the contract of her master, and not by an antecedent agreement with third persons, not the agents of the ship, yet the Idefjord, by accepting the cargo for carriage with knowledge of the clean through bills, made the issuer of those bills its agent. It could not then accept the goods under its own conditions, and it was bound in rem for right delivery. The Sprott, D. C. S. D. N. Y., 70 F. 327; The Poznan, D. C. S. D. N. Y., 276 F. 418.

The decree is reversed, with directions to the district court to enter a decree in favor of libelant, and to proceed to assess the damages, by reference or otherwise as it shall determine.

Before he resigned Judge PATTERSON heard the argument of this appeal, and voted at the conference to reverse the judgment. Since his resignation he has read this opinion and authorizes us to say that it accords with his views.